## MARION L. KINGERY, PERSONAL REPRESENTATIVE OF THE ESTATE OF LYLE B. KINGERY, DECEASED *v.* DEPARTMENT OF REVENUE

Lee A. Hansen, Brown, Hansen & Steenson, P.C., Portland, represented plaintiff.

G. F. Bartz, Assistant Attorney General, Salem, represented defendant.

Decision for plaintiff rendered October 23, 1975.

CARLISLE B. ROBERTS, Judge.

The plaintiff appeals from defendant's Order No. IH 74-2, issued on April 24, 1974. The question before the court is the fair market value for inherit-

ance tax purposes of 4,058 shares of Chinook Investment Company common stock held by Lyle B. Kingery, deceased, on July 10, 1972, the date of death.

Chinook Investment Company is a closely held family investment corporation and the decedent owned a minority interest therein. The 4,058 shares owned by him represented approximately 14 percent of the outstanding shares of the corporation, which is not sufficient to force a liquidation. The corporation has been operating for 65 years. The majority stockholder, Mrs. Kingery, the decedent's wife, owns 50 percent of the corporation's stock, and is 70 years of age. All the stockholders of the corporation at the time of decedent's death were members of the same family.

Chinook stock was the subject of prior litigation in *Kingery v. Granquist,* an unreported case (Civ Dkt No. 8023, D Or 1956), found in 56-1 USTC ¶ 11,587, 52 AFTR 1953. It was relied on by defendant in its Order No. IH 74-2 as the basis for asserting book value herein, but a reading of the decision does not aid this court in this determination.

The Department of Revenue contends that the value of the stock should be $63 per share, which is based on the underlying asset value of the stock.[1] The defendant produced only one witness who merely testified that the corporation's stock had no market. The Department of Revenue chiefly relies on cases which do not allow discounts from underlying asset value when determining the fair market value of stock.

The plaintiff presented two witnesses, one of

---

[1] The underlying asset value of the stock is the fair market value of all the assets of the corporation less the liabilities of the corporation, divided by the total number of the outstanding shares.

whom, Mr. Ross J. Cadenasso, was offered as an expert in the valuation of closely held stock. He arrived at a value of $22.16 per share by applying two discounts to the underlying asset value of the shares.

Mr. Cadenasso began with an underlying asset value per share of $62. He then applied a discount of 35 percent to reflect how other companies have had their shares discounted from underlying asset value in the market. This figure was found after studying the price discount from underlying asset value of five closed-end investment companies in which there was an active market. The five companies had discounts ranging from 27 to 49 percent, with the smaller companies, nearer the size of Chinook, having discounts of 40 and 49 percent. The witness also considered the fact that, as compared to the other companies, a large proportion of Chinook's revenue went to operating expenses and taxes (58 percent versus 20 percent). The 35 percent figure arrived at by the expert seems reasonable, considering the premises on which it is based.

After taking a 35 percent discount from the underlying asset value of $62, a value of $40.30 was established. This figure represented Chinook's value if it enjoyed an active trading market. However, the evidence was to the effect that Chinook is not and probably never will be an actively traded stock. A discount, therefore, must be applied to adjust for this condition under the assumption that no willing buyer could be found for a stock which has no active trading market when comparably valued stock can be found with an active trading market. The expert witness arrived at a further discount of 45 percent after studying the average discount given to 80 "letter stock" transactions. (The witness defined "letter stock" to be identical to freely traded stock in a com-

pany except that it cannot be sold, because of Securities and Exchange Commission restrictions, for a period of at least three years. (Currently, a two-year holding period is required.)) The average discount of the 80 transactions studied was 33.7 percent. The witness reasoned that if such a large discount was made for stocks restricted for two- and three-year periods, a discount of 45 percent would not be unreasonable for stock which would never be marketable. Applying this second discount of 45 percent to the $40.30, the witness arrived at the value of $22.16 as the fair market value of the decedent's interest in Chinook Investment Company stock on July 10, 1972.

Many pages could be filled discussing in minute detail the methodology employed by Mr. Cadenasso in reaching his conclusion. All that need be said is that, after careful study of the financial statements of the company for the last few years and review of the methodology employed by plaintiff's expert witness, there appears to be no substantial fault with the conclusion.

This is not to say the logic of the witness was impeccable in all respects. There are a few places in the chain which raise doubts as to the methodology employed. In one instance, the witness stated that since Chinook's assets were not as liquid as marketable securities held by the five comparable companies, a larger discount would be appropriate. It would seem that if liquidity is sufficient to meet operating expenses, and the stock is being evaluated on a going-concern basis, there is no reason to consider this as a negative factor. Liquidity would be important if a liquidation value were being utilized instead of a going-concern value.

Another questionable argument was offered when

the witness considered the possible liquidation value of the stock, as a backup to the $22.16 figure. The liquidation value was determined by discounting the $62 per share underlying asset value back from assumed future liquidation dates. This figure assumed zero growth in the underlying assets, despite the growth in book value, and presumably underlying asset value, over the immediately preceding years. A higher value should have been used.

These two minor points do not affect the basic soundness of the methodology employed by the plaintiff.[2]

■ The valuation of the stock of a closely held family investment corporation is certainly not an exact science. The statute, Int Rev Code of 1954, § 2031; the regulation, Treas Reg § 20.2031-2(f); and the ruling, Rev Rul 59-60, 1959-1 Cum Bull 237, 243, merely provide guidance for this arduous task. The case law in the area only gives broad guidelines for a court to consider. *In re Estate of Frank,* 123 Or 286, 261 P 893 (1927); *Est. of Burger, Decd. v. Dept. of Rev.,* 5 OTR 240 (1973). The court can evaluate only the evidence brought before it.

The plaintiff's expert witness presented extensive evidence on how this stock should be valued. The defendant has presented virtually no evidence, but has chosen to rely on the underlying asset value of the stock.

The defendant's theory is that there should not be any discounts at all from the underlying market

---

[2]
"* * * Persons of speculative minds may in almost every * * * case suggest possibilities of the truth being different from that established by the most convincing proof. * * *" *Hopt v. People of Utah,* 120 US 430, 440, 7 S Ct 614, 30 L Ed 708, 711 (1887).

value of the shares. It relies on *H. Smith Richardson*, 12 P-H Tax Ct Mem ¶ 43,496 (1943), *aff'd*, 151 F2d 102 (2d Cir 1945), 34 AFTR 132, *cert denied*, 326 US 796, 66 S Ct 490, 90 L Ed 485 (1946), for the proposition that the stock of a closely held family-holding corporation should not be discounted. The reliance on *Richardson* is clearly erroneous. A reading of the Second Circuit's affirmation indicates that the court did not agree with any overall conclusion that no discounts are allowable as a matter of law. *See also Drybrough v. United States*, 208 F Supp 279 (WD Ky 1962), 62-2 USTC ¶ 12,098, 10 AFTR2d 6250, 6255-6256, and cases cited therein.

The defendant also relies heavily on arguments found in an article written by Allen L. Feld, *The Implications of Minority Interest and Stock Restrictions in Valuing Closely-Held Shares*, 122 Pa L Rev 934 (1974). Feld argues that minority shares should not be given a discount because of the ability of a family to avoid paying its fair share of taxes. If a family owns a million dollars in assets, Feld hypothesizes, it could avoid estate taxes by incorporation and dividing the stock into a number of minority interests. The sum of the values held by all the minority stockholders would be less than one million dollars.

The analysis by Feld may have some persuasiveness from an equitable point of view, but the law's mandate is clear. The whole value of a corporation is not necessarily equal to the sum of its parts when it is owned by a number of minority stockholders. This notion was set forth in the case of *Colonial Trust Co. v. Kraemer*, 63 F Supp 866, 871 (DC Conn 1945), 46-1 USTC ¶ 10,250, 34 AFTR 934, 939:

> "The clear policy of the statute and applicable treasury regulation indicates, however, that it is the fair market value of the stock or its approxima-

tion based on the company's earning power, dividend-paying capacity, and all other factors, that is to be considered for estate tax purposes. * * * And that policy applies to closed or family corporations such as the one here. * * * If this method of evaluation leaves the door open to partial evasion of the estate tax through the organization of a family corporation[,] it is nevertheless an incident of the present tax policy and it is the province of Congress to close that door."

No testimony has been offered or authority cited to show that a minority shareholder can regularly be deemed to have leverage in a family corporation because of his kinship in the family, and the strangers who make the market patently have no advantage.

 Many recent cases have allowed substantial discounts for minority interest in closely held investment corporations. *Hicks v. United States*, 486 F2d 325 (10th Cir 1973), 33 AFTR2d 74-1384, *cert denied*, 416 US 938, 94 S Ct 1939, 40 L Ed2d 289 (1974); *Est. of Maurice Gustave Heckscher*, 63 TC 485 (1975); *Edwin A. Gallun*, 43 P-H Tax Ct Mem ¶74-284 (1974); *Inga Bardahl*, 24 CCH Tax Ct Mem 841 (1965). The testimony of plaintiff and the authorities cited outweigh the arguments of the defendant in the present case.

The court holds that the value of the 4,058 shares of Chinook Investment Company common stock held by Lyle B. Kingery, deceased, on July 10, 1972, the date of death, was $89,925.28 or $22.16 per share. Defendant's Order No. IH 74-2 is vacated, set aside and held for naught and its Notice of Determination and Assessment of Inheritance Tax No. 194998 shall be withdrawn or modified as required by this decision. The estate is entitled to its reasonable costs.