Argued July 6, affirmed September 23, 1976

KINGERY, *Respondent,*
*v.*
DEPARTMENT OF REVENUE, *Appellant.*

554 P2d 471

*G. F. Bartz,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs were Lee Johnson, Attorney General, and Walter J. Apley, Assistant Attorney General, Salem.

*Lee A. Hansen,* Portland, argued the cause for respondent. With him on the brief were Brown, Hansen & Steenson, P.C., Portland.

BRYSON, J.

## BRYSON, J.

Defendant appeals from a decree of the Oregon Tax Court which reversed an order of the Department of Revenue relating to the fair market value for inheritance tax purposes of 4,058 shares in Chinook Investment Company (hereinafter Chinook), a closely held family investment corporation. 6 OTR 202 (1975). As stated by the Tax Court, the issue is how these shares should be valued for inheritance tax purposes.

Chinook was organized and incorporated in 1911. It has always been operated as an investment type company and at the time of decedent's death, on July 10, 1972, improved real property comprised approximately 44% of its total assets. Cash, marketable securities and notes receivable accounted for 56%. The parties stipulated that as of June 10, 1972, the value of the real property was $944,000 and that the value of the stock holdings was $1,050,000.

At his death Lyle B. Kingery, son-in-law of the founder, owned 4,058 shares or approximately 14% of the 28,890 outstanding corporate shares. The remaining shares were held as follows: 18,082 shares by Mrs. Kingery (wife of decedent), and 3,375 shares each by Susan Kingery Wise (daughter of decedent) and Frederick A. J. Kingery (son of decedent). The shares are not listed on any stock exchange and are not traded over the counter.

Plaintiff's complaint alleged:
"* * * * *.

"V.
"The true cash value of decedent's 4,058 shares of Chinook Investment Company as at July 10, 1972 was no more than $66,957.00 or $16.50 per share."

The Department of Revenue's answer admitted all of the allegations of plaintiff's complaint except the foregoing paragraph V, to which it filed a general denial.

[ 243 ]

The Tax Court held that the value of the 4,058 shares of Chinook held by the deceased at the date of his death "was $89,925.28 or $22.16 per share." The defendant appeals. We review de novo. ORS 305.445.

Defendant, Department of Revenue, first contends that "[t]he Tax Court erred in not finding that the way to value the stock of Chinook Investment Company is to find the value of the underlying assets of the corporation."

The Department of Revenue contends that the value of the Chinook stock is $63 per share, which is based on the underlying asset value of the stock. The underlying asset value of the stock is the fair market value of all the assets of the corporation less the liabilities of the corporation divided by the total number of outstanding shares.

The plaintiff called two expert witnesses to testify on the valuation of the shares of Chinook. Mr. Garthe Brown, attorney and accountant, testified that he had prepared the tax returns for the corporation and its principal stockholders since 1943. Balance sheets were received in evidence covering the company's operation for the five years preceding death of the decedent. The average earnings over that time period was $1.42 per share, which he capitalized at 10%. Mr. Brown testified that the book value was $21.96 per share and the capitalized income value was $14.20 per share. He then averaged these two figures with the book value figure weighted by a factor of one and the capitalized income figure weighted by a factor of two. From these computations he testified that the value per share of Chinook was $16.79.

The plaintiff also called Mr. Cadenasso, a corporate financial consultant and appraiser. He also had experience in appraising closely held corporations.[1]

---

[1]Investment companies may be generally classed into two types: open-ended and closed-ended. Open-end investment companies stand ready at all times to redeem their shares for an amount equal to the prorata

The Tax Court adopted the valuation method used by the expert Cadenasso. Mr. Cadenasso took Chinook's underlying assets per share, including the market value of the corporate stocks held by Chinook as of June 30, 1972. He determined this to be $62 per share. Due to the fact that Chinook is a closely held company with 44% of assets in real estate with an average of 58% of its total income being used for operating expenses and income taxes, he discounted the $62 per share at the rate of 35% and arrived at a figure of $40.30 per share. He testified regarding sales of shares of other closed-end investment companies which he offered as comparables. He then discounted the $40.30 per share by 45% on the basis that the Chinook stock did not have a ready marketability, as did his other comparables, and that this lack of marketability would not change in the near future.[2] On this basis he arrived at a fair market value per share of $22.16 for a 14% minority interest (the deceased's interest) in Chinook stock as of July 10, 1972. The $22.16 per share valuation on Chinook stock is the figure adopted by the Tax Court in its decision.

The defendant offered no evidence as to the market value of the Chinook corporation shares of stock at the

portion of the current net assets of the investment fund represented by the shares surrendered. Closed-end investment companies do not. A shareholder's interest in a closed-end investment company can only be disposed of in the market place unless the corporation specially agrees to purchase it. Chinook Investment Company is of the closed-end variety and did not agree to purchase.

In recent history closed-end investment company securities have typically sold for an amount less than their prorata share of the underlying assets (Public Policy Implications of Investment Company Growth, H. Rep No. 2337, 89th Cong 3d Session (1966) p. 42). One of the reasons for this, according to Mr. Cadenasso, is because "a significant portion of the income from these underlying investments is used to pay administration expenses and income taxes and is not available for distribution as dividends to the investment company stockholders or for reinvestment."

[2] Mr. Cadenasso testified that the investment company would probably be liquidated upon the death of Mrs. Kingery. It would not be practical to liquidate prior to this time due to the large capital gains which would be realized upon such a termination. Mrs. Kingery was 70 years old and in good health.

time of decedent's death. The defendant called one expert, a stockbroker, who testified as follows:

"Q Would there be any market for this kind of stock, in your opinion?

"A Perhaps within the perimeters that have been discussed earlier there — but not — not as a practical matter, no."

On cross-examination he testified:

"Q When you say 'within the perimeters discussed,' in other words, at the right price there would be a market for this stock?

"A Yes."

The defendant's contention in this appeal is that, as a matter of law, there should be no discounts from the underlying market value of the shares of Chinook corporation. The Department of Revenue argues that when appraising the stock of a closely held family investment company the court should look to the value of the stock to the recipient, taking into account the special circumstances[3] of that recipient, such as his or her other holdings in the same securities or his or her membership in the control group dominating the decision-making processes of the closely held family corporation. In short, it is defendant's contention that the stock should be appraised at the value to the heirs based on the underlying assets of the corporation.

ORS 118.150(1) governed the inheritance tax valuation of decedent's estate at the time of his death. It provided:

"(1) The personal representative of the estate of a decedent shall inventory the property of the estate as provided in ORS 113.165; but when an interest is contingent, defeasible or of such a nature that its true

---

[3] Although this special circumstances evaluation standard constitutes the underlying theme of the Department of Revenue's valuation theory, the Department is not clear on whether it is the special position of the decedent or the beneficiary which is to be taken into account. Under *In re Lewis' Estate,* 160 Or 486, 85 P2d 1032 (1939), if special circumstances are to be taken into account then they should be the special circumstances of the beneficiary. However, the Department of Revenue offered no evidence as to the situation of the instant beneficiaries.

cash value cannot sooner be ascertained, it shall be determined at the time when the value first becomes ascertainable, *at its true cash value* as of the date of decedent's death and without diminution for or on account of any valuation made or tax paid theretofore upon the particular estates upon which the devise, bequest, legacy or gift may have been limited. * * *" (Emphasis added.)

At the date of death ORS 113.165 provided that:

"* * * The inventory shall show the estimates by the personal representative of the respective *true cash values* as of the date of the death of the decedent of the properties described in the inventory." (Emphasis added.)

It does not appear that the words "true cash value" have been interpreted by this court. The predecessor to ORS 118.150(1) was ORS 118.640(1), which provided:

"(1) Every inheritance, devise, bequest, legacy or gift upon which a tax is imposed under ORS 118.005 to 118.840, shall be appraised at its *full and true value* immediately upon the death of the decedent, or as soon thereafter as may be practicable * * *." (Emphasis added.)

■ In *Unander v. Murphy,* 208 Or 77, 299 P2d 813 (1956), we held that the words of the predecessor statute, "full and true value," meant market value. "Market value" had been interpreted as being synonymous with the terms "cash value" or "actual value." *In re Estate of Frank,* 123 Or 286, 261 P 893 (1927). There is no evidence that the legislature intended any change in its prior statutory direction, that the value commanded by the inherited property in the market place should be controlling, by its substitution of the words "true cash value" for the words "full and true value" when it reenacted ORS 118.640(1) as 118.150(1).

The Department of Revenue interpretation of this statute, OAR 150-118.150(1), acknowledges the market value standard and states:

"The inheritance tax is imposed upon the true cash value of the property even in the case of limited and

[ 247 ]

future estates. True cash value shall be taken to mean the amount in terms of money which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing and well informed. * * *"

■ The appraisal standard urged by defendant, as a matter of law, has been rejected by this court. *Unander v. Murphy, supra* at 91. *See also Richardson v. Commissioner of Internal Revenue,* 151 F2d 102, 105 (2d Cir 1945), *cert denied* 326 US 796, 66 S Ct 490, 90 L Ed 485 (1946). The reliance upon *Richardson* by the defendant is misplaced. In *Richardson* the appeals court rejected the use of any valuation measure which is based upon anything other than the market value of the stock. In that case, rather than accepting the use of the undiscounted underlying assets approach to valuation, the court required that the value assigned to the stock reflect the price at which the stock could be sold in the market place.

In the case *In re Estate of Frank, supra,* this court noted:

"* * * It is apparent, therefore, that, in determining the actual value of stock in a close corporation, book value, earnings, dividends, goodwill of the business, future prospective profits, and any other fact or circumstance *which would influence a person ready, able and willing to buy such stock,* should be taken into consideration. * * *" (Emphasis added.) 123 Or at 290.

It may well be that the property subject to inheritance tax is worth more to the heirs than it would bring on the market between a willing buyer and a willing seller. It may also be true that these types of closely held family investment companies constitute a haven from inheritance and gift taxes.[4] However, the

---

[4] Boston University's Professor Feld has detailed the potential for tax avoidance created when this objective market standard is applied to value minority interests in closely held family companies. See Feld, "The Implications of Minority Interest and Stock Restrictions in Valuing Closely-held Shares." 122 Penn L Rev 934 (1974).

legislature has determined that it is the market value of the inherited property which is to control and this court has consistently followed the statutory mandate. It is the province of the legislature, not the court, to change this standard if it is inequitable.

It should be noted that the evidence in this case shows that Chinook Investment Company has been in existence in its present form for 65 years. This is not the case of a closely held family investment company formed in contemplation of minimizing or avoiding state inheritance taxes. *See Unander v. Murphy, supra* at 90.

■ The Tax Court determined that the proper valuation method was what the shares of Chinook would sell for in the market place in a transaction between a willing buyer and a willing seller, neither being under any compulsion to buy or sell. There is substantial evidence to support this finding and we reach the same conclusion.

■ The defendant also assigns as error the Tax Court's allowance of a "double discount" in arriving at the fair market value of the Chinook shares.

The Tax Court correctly observed that the valuation of "the stock of a closely held family investment corporation is certainly not an exact science."

When reviewing methodology, this court noted, in *Unander v. Murphy, supra* at 89, that:

"* * * Where, as here, the interest is part of a family held corporation and there have been no sales of the stock of the company, the problem is difficult. Valuation then becomes, in part at least, a problem of avoiding the capricious and arbitrary while giving adequate recognition to the real. It is apparent that each case requires a determination on its own merits. * * *"

In the case of *In re Estate of Frank, supra,* this court concluded that it was not advisable to lay down a

hard-and-fast rule to be followed in estimating the value of stock in a closely held corporation. We stated:

"* * * It is not advisable to lay down a hard-and-fast rule which should be followed in estimating the value of stock in a close corporation. Any method used must stand the test of reason. * * *" 123 Or at 290-91.

In the present case we are confronted with the defendant having presented no evidence as to how this stock should be valued. Defendant relied, at the trial level and again here, on a proposition of law. The plaintiff's expert witness Cadenasso presented extensive evidence as to how this stock is to be valued, which included the so-called "second discount." At first blush it appears that the total discount applied by plaintiff's expert witness is unrealistic. However, the evidence shows that the per share book value is $21.96. The first discount of 35% applied by the expert witness was the same or similar to that applied on actual sales of the comparable corporations. Those comparables were based on sales of stocks that were publicly traded. Each company was a closely held investment company holding highly marketable securities. They each had active trading markets and yet they sold at discounts ranging from 27% to 49%. Their operating overhead was a lower percentage than that of Chinook. Chinook shares have no active trading market. In this connection, the expert witness arrived at a further discount after studying the average discount given to "letter stock" as being the same as other stock being freely traded on the market except that it cannot be sold, because of Securities and Exchange Commission regulations, for a period of at least three years. In the instant case, based on the testimony of this stock not being liquidated for a period of approximately 10 years, he arrived at what he concluded was a fair discount because of lack of marketability.

It is impossible to discuss all of the testimony offered by the plaintiff in support of his case. However, it is substantial and logical, and the defendant

offered no testimony. We conclude that the value fixed to the shares of Chinook by the Tax Court withstands the test of reason. There is substantial evidence to support the conclusion, and we find no error in this respect.

Affirmed.