# IN THE OREGON TAX COURT

## EUSTON
*v.*
## DEPARTMENT OF REVENUE
(TC 2337)

Daniel C. Re and William Holmes, Gray, Fancher, Holmes & Hurley, Bend, represented plaintiff.

Ted E. Barbera, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered December 17, 1985.

### CARL N. BYERS, Judge.

This case concerns the value of two assets for Oregon inheritance tax purposes. Plaintiff is the personal representative of the Estate of Pearl Stokesberry who died November 19, 1982. As of that date, two of the assets owned by Mrs. Stokesberry were as follows: A promissory note and mortgage dated December 28, 1979, in the face amount of $180,000, bearing interest at 10 1/2 percent per annum due and payable December 15, 1987. The principal amount owing

under the note at Mrs. Stokesberry's date of death was $130,341.24, payment of which was secured by a mortgage on improved real estate. Payment was also personally guaranteed by the parties assigning the note to Mrs. Stokesberry.

The second asset consisted of a contract of sale dated June 11, 1981, between Mrs. Stokesberry as the seller and Northwest Surgical Associates, P.C., Pension and Profit Sharing Trust as the buyer.[1] The sale price under the contract was $170,000, $50,000 down and the balance payable in nine equal installments of $15,776.85. Since the installments are based on a 15-year amortization schedule there is a balloon payment due at the end of the 10 years. The unpaid balance of the contract bears interest at the rate of 10 percent. The subject of the contract was six acres of bare land located in the City of Bend.

The issue in this case is the true cash value of the two assets as of the date of the decedent's death. It should be noted that we are not concerned with the value of real estate, which is only security for the payment of the obligations. What is being valued is the "paper" or rights of the decedent as expressed by the two documents described above. To establish the true cash value of such, it is necessary to determine whether a market for such assets exists and, if so, what that market indicates the value of these assets is.

Plaintiff's evidence established that there is a recognized market for the purchase and sale of notes secured by mortgages and for real estate contracts. (For brevity, hereafter called "paper.") Many of the various factors which influence property values generally become considerations in this market. Plaintiff's witness, Mr. Robert Phister, actively engages in the market, both buying and selling paper as a broker and on his own account in the Bend area. Mr. Phister indicated that the first step in valuing paper is to investigate the transaction underlying the document, including, for example, the value of the security, the financial circumstances of the obligor and the payment record. When he has ascertained the

---

[1] The parties have treated the pension and profit sharing trust as the obligor under the contract. It should be noted that a trust as such does not own property. Presumably, the trust has a trustee who holds the legal title to all property of the trust and should be the proper party to the contract. *Morse et al v. Paulson et al,* 182 Or 111, 186 P2d 394 (1947).

"background" of the paper, he makes three calculations. Those three calculations are as follows:

(1)    The present value of the cash flow, using a current market rate of interest.

(2)    The ratio of the "loan" to the value of the security. He indicated that as a rule of thumb investors in paper will not pay more for the obligation than 50 percent of the value of the underlying security.

(3)    Any minimum discount applied by a broker or buyer. He indicated that institutional purchasers usually have a minimum discount rule of 30 percent.

Mr. Phister testified that the value of any paper is limited to the lesser of the values indicated by these three calculations.

Utilizing those three calculations, Mr. Phister concluded that the note and mortgage had a true cash value as of the date of decedent's death of $91,200. This conclusion was based on the minimum discount value calculation. Mr. Phister testified that transactions in the $100,000 range are too large for private investors. Obligations of this magnitude are usually purchased by an institution which would insist upon the 30 percent discount. Mr. Phister valued the contract at $71,500, based on the loan to value ratio calculation. He supported this conclusion by testifying that in 1982 the economy was in a recession and there was no market for bare land.

Mr. Roger Russell also testified for the plaintiff and elaborated on the extent of the market for paper. He indicated that the recession had caused an increase in the paper market due to the tightening of traditional bank loans and the increase in seller financing. This has caused the state Corporation Division to become more involved, resulting in new laws and regulations. Mr. Russell also explained that the "loan to value ratio" rule of thumb varies with the type of property involved. He noted that paper secured by bare land will be discounted 50 percent because bare land is the least desirable security. Improved property which can produce income to service the debt justifies less discount and paper secured by an owner-occupied residence incurs the least discount.

Mr. Russell pointed out two other negative influences. He indicated that "balloon" payments are undesirable because studies have shown that 90 percent of balloon payments are not paid timely and over 70 percent are never paid at all. He also pointed out that contracts are less desirable because the assignee of the vendor's interest steps into the vendor's shoes and becomes subject to all of the claims, offsets and defenses of the vendee. After considering the above factors and others, Mr. Russell gave his opinion that the note and mortgage had a fair market value of $91,238 and the contract had a true cash value of $69,142.

Defendant submitted no evidence. Defendant relied upon the "presumption" created by the department's regulations that the true cash value of the paper is equal to the face amount due plus accrued interest. It is apparent that the defendant has difficulty accepting the proposition that note and contract holders will sell their paper at substantial discounts without duress. The evidence does not support defendant's position. Both witnesses indicated that typical sellers not under duress are senior citizens who don't want to wait 10 years for a contract to mature or pay off; businessmen who can employ the money in their business and make a greater return than they "lose" on the discount of their paper; and those who are willing to accept less gain from the sale of a property.

The governing statute, ORS 118.150, provides:

"(1) The executor of the estate of a decedent shall appraise the property of the estate at its true cash value as of the date of the death of the decedent."

Although subsections (2), (3), (4) and (5) of the statute provide special rules for valuing particular kinds of assets, none of those subsections apply to the secured notes and contracts in issue here.

The defendant, in fulfillment of its duties, has promulgated OAR 150-118.150(1) which defines true cash value and specifies rules for specific types of assets. Consistent with the statute, the regulation defines true cash value:

"True cash value shall be taken to mean the amount in terms of money which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to

sell or buy and are able, willing and reasonably well-informed. All transfers taxable under the inheritance tax laws and made during the lifetime of the decedent are valued at the market value of the property at the decedent's date of death. *All relevant facts and elements of value as of the date of death will be considered in the determination of value.*" (Emphasis added.)

The regulation expressly provides for the valuing of notes and contracts. It states:

"Secured or unsecured notes and contracts shall be valued at face value, plus accrued interest to date of death, unless the executor can establish by satisfactory evidence that the item is worth less. Factors that will be considered include:

"(a)   Low interest rate.

"(b)   Unreasonable maturity date.

"(c)   History of delinquency and the obligation is not adequately secured.

"(d)   Debtor is not financially responsible.

"When a discount is deemed proper because of a low interest rate or unreasonable maturity date, the discount allowed shall be the amount which will produce a yield factor comparable to the current real estate first mortgage market in effect in the general area on the date of death. If a discount is claimed for other factors, evidence to support the discount should be submitted with the return.

"When it is necessary to sell a note or contract to pay the debts, expenses of administration or taxes, the value is the gross sales price. A sale that is not bona fide and at arms length will not be considered."

The statute must control. If the regulation quoted above is inconsistent with the statute, the regulation must give way. While the department may promulgate regulations or administrative rules interpreting legislation, such may not be contrary to the expressed intent of the legislature.

The regulation quoted above contains several inconsistencies both internally and with the statute. The regulation is inconsistent with the statute to the extent that:

(a)   It properly defines true cash value but then adopts a nonmarket standard for notes and contracts.

(b)   It ties any "discount" allowed to the yield realized in the current real estate first mortgage market in effect, a standard which may or may not relate to true cash value.

(c)   It adopts "gross selling price" as the value when necessary to sell the note or contract to pay debts, expenses of administration or taxes. Even though arm's length, such a sale may nevertheless be a distress sale and not reflective of true cash value.

The regulation is internally inconsistent to the extent that it indicates "all relevant facts and elements of value as of the date of death will be considered in the determination of value" and then attempts to limit the factors that will be considered in establishing a value less than face value.[2] In fact, the regulation specifies three different values; "true cash value," "face value plus accrued interest," and "gross sales price." Of these three standards, only true cash value is consistent with the statute. For these reasons, the court can give little weight to the presumption relied upon by defendant. Nor will the court limit the facts and factors considered which affect the value of notes and contracts in the marketplace.

■   Defendant argues that the state regulations and tests are based on the federal regulations and tests. In support of its position, defendant cites *Kingery v. Dept. of Rev.,* 6 OTR 202 (1975), and *Estate of Robinson v. Commissioner,* 69 TC 222 (1977). In *Kingery,* this court allowed discounts from the "underlying value of the stock" (assumed to be the fair market value of the assets actually owned by the corporation) in a closely held family corporation. Based on expert testimony, it appeared that the lack of marketability of a minority interest in a closely held corporation justified a substantial discount from the stock's otherwise inherent value. This decision was affirmed by the Oregon Supreme Court in *Kingery v. Dept. of Rev.,* 276 Or 241, 554 P2d 471 (1976). It is interesting to note that defendant in that case also did not present any evidence

---

[2] The regulation also states:

"If a discount is claimed for other factors, evidence to support the discount should be submitted with the return."

No issue has been raised by the defendant with regard to this requirement (if it is a requirement, it is not stated in mandatory terms) and therefore is not considered by the court.

but relied upon a proposition of law. The *Kingery* case simply affirms that when the test is true cash value, the facts and logic of the marketplace, not the rules of tax administration, must govern.

*Estate of Robinson, supra,* comes closer to the mark in that it also involved the value of an installment note. However, the taxpayer in that case was not contending for market value. The note in that case, which had a balance of $1,120,000, was discounted by the parties to $930,100 as its agreed *market value.* What the taxpayer sought for was to have the court further discount the note in recognition of its inherent income tax liabilities. This the court refused to do because the federal tax structure makes provisions to avoid paying both income taxes and federal estate taxes on the same income. The point, however, is that the note was discounted to its fair market value without dispute.

As in *Kingery v. Dept. of Rev., supra,* in this case the defendant has not introduced any evidence. Defendant has chosen to rely upon the "presumption" created by the regulation. In this case, however, plaintiff's evidence has overcome the "presumption." The court finds that the true cash value of the Nichols-Crabbe note (Exhibit 1) as of November 19, 1982, was $91,200 and that the value of the contract (Exhibit 2) as of November 19, 1982, was $71,500. The opinion and order of the Department of Revenue is hereby set aside and the department shall compute and refund such taxes and interest as may be due under the law. Plaintiff shall recover her costs and reasonable attorney fees.