Argued and submitted January 30, reversed and remanded for reconsideration in part; otherwise affirmed May 24, 1995

# In the Matter of the Marriage of

## Sandra Lee TOFTE,
*Appellant,*

*and*

## Kenneth Lee TOFTE,
*Respondent.*

## (92C 34646; CA A84225)

895 P2d 1387

Timothy B. O'Neill argued the cause for appellant. With him on the brief were Dora L. Lutz and O'Neill, Evans, Swogger & Cowan.

Kim E. Hoyt argued the cause for respondent. With her on the brief was Ferder, Ogdahl, Brandt & Casebeer.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

RIGGS, P. J.

**RIGGS, P. J.**

Wife appeals a dissolution of marriage judgment, challenging those portions of the judgment relating to child support, spousal support and the division of property. On *de novo* review, ORS 19.125(3), we modify in part, reverse and remand in part and otherwise affirm.

The parties were married for 19 years. They have two children who, at the time of the trial, were ages 17 and 12. By agreement of the parties, wife was awarded custody of the children. The trial court awarded child support of $700 per month. The trial court awarded wife spousal support of $500 per month for an indefinite period, commencing March 10, 1994, plus 30 percent of the gross amount of husband's annual bonus for a period of five years, commencing January 1994.

Husband, age 35, is a high school graduate. For a number of years he has been employed by Enchanted Forest, Inc., an amusement theme park owned by his family. At the time of trial, his employment responsibilities included supervision of a maintenance crew and various jobs requiring expertise in welding, plumbing, electrical work and sound systems. Husband is also heavily involved in the creation of many of the park's attractions, including the design and building of robotics and animatronics.

Wife, age 34, has a ninth grade education. She was 15 years old when she married husband and did not re-enter educational programs until a short time before trial. Since that time, she has periodically attended Chemeketa Community College, working towards her GED. Wife has experienced some difficulties in returning to her educational pursuits. She anticipates that it will take approximately three years to complete her education and to obtain a job at which she can eventually earn $1,200 per month. For the last seven or eight years, wife has been on medication for depression. Her depression has interfered with her educational efforts and she fears that she would be unable to hold a job at the present time, because of that condition. A vocational rehabilitation counselor testified that wife can expect to earn between $7.50 and $8 per hour if she completes a two-year clerical program. That expert also testified that wife would be able to earn

between $8.50 and $9 per hour after three to five years. Aside from her depression, wife is in good health.

Husband and his three sisters each own 10.1 percent of the shares of stock in Enchanted Forest, Inc., and his mother and father each own 29.8 percent. They are all corporate officers, but husband's father has the final say on most issues relating to the corporation. In 1993, husband's annual salary, excluding his bonus, was $39,600, or $3,300 per month. In addition to his salary, husband received a $37,000 bonus in January 1993, for the 1992 year. Husband has received annual bonuses for a number of years. Since 1989, including salary and bonuses, husband's gross income has ranged from $74,000 to $79,000 per year. At trial, husband testified that he did not expect to receive an annual bonus in January 1994, for the 1993 business year. Husband's father also testified that the 1993 business season had been financially unrewarding and that certain additions to the theme park would probably preclude the payment of a bonus. However, after trial, but before entry of the judgment, husband did receive a bonus of $36,000 for the 1993 business year. The trial court allowed wife's motion to reopen the hearing to consider husband's receipt of that bonus before it rendered its final judgment.

We begin with the issue of child support. Wife assigns error to the trial court's calculation of child support, arguing that the court erred in failing to include husband's 1993 bonus as part of his gross income. She also argues that the court did not consider whether the tax consequences of awarding husband the right to claim state and federal tax exemptions for the children rebutted the presumption that the child support amount was correct.

The trial court made these findings:

"12. Petitioner is unemployed and has an imputed gross monthly income of $823; *Respondent's gross monthly income is $3,300.*

"* * * * *

"14. For purposes of determining the appropriate amount of child support that Respondent is to pay Petitioner, pursuant to the Oregon Uniform Child Support

Guidelines[1] as provided herein, the court calculated the amount of child support *by using the base gross incomes of Petitioner and Respondent as stated above*, added in the spousal support ordered herein, and compared that to the required child support using the base gross incomes of Petitioner and Respondent, the spousal support and the projected distribution of Respondent's bonus as ordered to be divided between Petitioner and Respondent as provided herein. The court finds that considering the circumstances of the parties, the amount of child support ordered herein in the amount of $700 per month is just and equitable and consistent with the Uniform Child Support Guidelines.

"15. *There is no reason to rebut the presumptively correct level of support.*

"* * * * *

"19. The court entertained the Petitioner's Motion to Reopen and Supplement Evidence dated February 11, 1994, and considered Respondent's Stipulation of Fact, *and therefore finds that the Respondent received a bonus in January 1994 for the 1993 business year in the amount of $36,000.*" (Emphasis supplied.)

■ The first step in calculating the appropriate amount of child support under the guidelines is to determine each parent's "gross income." OAR 137-50-330(1)(a). "Gross income" is defined by OAR 137-50-340(1) as

"income from any source, including but not limited to salaries, wages, commissions, advances, *bonuses*, dividends, severance pay * * *." (Emphasis supplied.)

Here, the trial court based its child support calculation on husband's salary of $3,300 per month, or $39,600 per year. However, the evidence in this case indicates that, historically, husband has received significant bonuses, in addition to his regular salary. Those bonuses have raised husband's income to a range of $74,000 to $79,000 per year. On this record, the trial court erred in failing to include husband's bonus in its initial calculation of his gross income. We therefore remand the case for recalculation of child support, with directions to include husband's bonus as part of his gross income.

---

[1] At the time the judgment was entered, a revised version of the child support guidelines had come into effect. However, the provisions applicable to the issues raised by wife and referred to in this opinion are the same under both versions of the guidelines.

■ Wife urges us to also remand with directions to consider awarding child support in an amount greater than the amount established by the child support guidelines. The level of child support determined under the guidelines is presumed to be correct. However, that presumption may be rebutted by "a finding that the amount is unjust or inappropriate," based upon the criteria set forth in OAR 137-50-330(2)(a). Wife argues that the presumption may be rebutted in this case, because husband, the noncustodial parent, was awarded the right to claim the state and federal tax exemptions for the parties' two children. *See* OAR 137-50-330(2)(a)(I) (child support formula presumes that the custodial parent will have the tax exemption allowed for the child or children). The trial court found that "[t]here is no reason to rebut the presumptively correct level of support." Nothing in the rule requires the trial court to rebut the presumptively correct amount of child support. *Sigler and Sigler*, 133 Or App 68, 73-74, 889 P2d 1323 (1995).

■ We next turn to the award of spousal support. On *de novo* review, we find that the amount of support awarded to wife is insufficient and that the calculation of a portion of wife's support based on a percentage of husband's future bonuses from the family-held corporation is inappropriate. In this fact-specific case, a detailed discussion of the various relevant factors beyond the relative incomes of the parties would not be enlightening to the bench or bar. It is sufficient to note that the testimony from wife and her vocational expert regarding the nature and type of work wife could expect in the future, coupled with evidence of the parties' ages, education, health, length of marriage and significant disparities in their capacities to enjoy economic circumstances and lifestyles similar to those enjoyed during marriage, require the provision of long-term spousal support that allows for a period of vocational training for wife. ORS 107.105(1)(d). We conclude that wife should receive spousal support of $1,300 per month for a period of 60 months, commencing March 10, 1994, and $800 per month thereafter, indefinitely.

Finally, wife assigns error to the trial court's property division, arguing that the court undervalued husband's 101 shares of Enchanted Forest, Inc., stock; erroneously

designated, as a marital debt, $36,000 owed to husband's parents; and failed to recognize husband's last bonus as an additional asset that should have been divided equally between the parties.

■     Husband and wife each presented expert evidence regarding the value of Enchanted Forest, Inc., and husband's shares in the closely held corporation. Both business appraisers used the capitalization of net earnings approach as their method of valuation, and both agreed that a capitalization rate or multiplier of nine times net earnings was appropriate. However, the experts presented conflicting evidence about the corporation's net earnings and whether it was appropriate to apply a minority or marketability discount to the value of husband's shares.

The trial court expressly found husband's expert to be more credible. On *de novo* review, we give great weight to the court's ability to see and hear witnesses. *Kampmann and Kampmann*, 108 Or App 407, 413, 816 P2d 642, *mod* 110 Or App 100, 820 P2d 1379 (1991). Wife urges us to adopt her expert's opinion, arguing that the trial court's valuation misallocated a net operating loss deduction and failed to consider the existence and significance, if any, of excess compensation to the corporate officers. On this record, we conclude that the trial court's valuation of Enchanted Forest, Inc., at $855,000 was reasonable and we are not persuaded by wife's arguments to the contrary.[2]

■     After calculating the value of husband's stock to be $834 per share, the trial court, relying on husband's expert's testimony, applied a 35 percent discount to the fair market value of the shares "to reflect the minority shareholder interest to reflect the lack of marketability * * *." It is not clear whether the court believed that a discount was appropriate because of the shares' impaired marketability or because husband holds a minority interest in the family corporation,

---

[2] Although we are inclined to agree with wife's expert's opinion regarding the correct allocation of the net operating loss deduction, the evidence does not adequately explain the effect and duration of that deduction with respect to the corporation's net income. Overall, we believe, as did the trial court, that husband's expert's calculation of the corporation's net income is more accurate, as it is based on a broader range of earnings records and is thus more representative of the corporation's true income potential.

or both.[3] However, both experts testified that the discount proposed by husband's expert was to compensate for lack of marketability.

Wife argues that a marketability discount is inappropriate in this case because there is no evidence that husband is contemplating a sale of his interest in the corporation. We have previously applied marketability and minority discounts without consideration of or speculation about the owner's intention to sell the shares. *See Olinger and Olinger*, 75 Or App 351, 707 P2d 64, *rev den* 300 Or 367 (1985) (discounting minority stock interest by 25 percent); *Reiling and Reiling*, 66 Or App 284, 673 P2d 1360, *rev den* 296 Or 536 (1983) (same); *Belt and Belt*, 65 Or App 606, 672 P2d 1205 (1983), *mod* 68 Or App 42, 680 P2d 390 (1984) (combined effect of restrictive bylaw provision and minority interest warranted discount of 50 percent). The basis for wife's argument stems from our decision in *Barlow and Barlow*, 111 Or App 179, 826 P2d 18, *rev den* 313 Or 299 (1992), in which we declined to apply an additional 50 percent discount to the value of a 15 percent interest in a closely held family farm corporation.[4] We stated:

---

[3] The trial court's statement is indicative of the confusion that exists when distinguishing, or, in most cases, failing to distinguish, between a minority interest discount and a marketability discount. A minority discount takes into account the relationship between the interest being valued and the total enterprise. A primary factor in determining the value of a minority interest is the *degree of control* that the owner either does or does not have within the corporation. Obviously, the degree of control must be analyzed in the light of the number and size of the remaining shareholders' interests in the corporation. For instance, a 20 percent minority shareholder may have greater control relative to two 40 percent minority shareholders than he or she would have relative to an 80 percent shareholder. In the former situation, a greater degree of control might justify a smaller minority discount than would be imposed in the latter.

In contrast, a marketability discount addresses the *degree of liquidity* of the interest. Such discounts compensate for the lack of a recognized market for a particular stock, lack of ready marketability, or restrictive provisions affecting ownership rights or limiting sale. A marketability discount may apply to either a minority *or* majority interest, and may be imposed in addition to a minority discount if circumstances warrant. Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 59 (2d ed 1989); W. Terrance Schreier and O. Maurice Joy, *Judicial Valuation of "Close" Corporation Stock: Alice in Wonderland Revisited*, 31 Okla L Rev 853 (1978).

[4] The trial court in *Barlow* had applied a 25 percent discount for lack of marketability. On appeal, husband argued that the discount should have been 75 percent, because of a restrictive bylaw provision and the fact that he held only a minority interest. Wife did not challenge the trial court's application of the 25 percent discount.

"A discount is an attempt to take into account the difficulty of actually turning an asset into money. The underlying assumption for discounting is that, in a hypothetical sale, only part of the corporate stock will be sold, with the remainder still being held by the other shareholders. *When that assumption is not supported by the evidence, a discount may not be proper.*

"\* \* \* \* \*

"*When no minority sale is planned, the valuation need not contemplate a discount, because the underlying rationale in the hypothetical market is not present.*" *Id.* at 182 (citations omitted; emphasis supplied).

The valuation approach we used in *Barlow* was justified by a fact situation quite distinct from that which exists here.[5] The rationale for applying a discount was not present in *Barlow*, because the farm's value was derived from its underlying assets, and there was expert testimony to the effect that "small family farm corporations are normally sold as a whole, usually by a sale of all the assets." *Id.* In other words, the expert testimony indicated that that type of corporation was not ordinarily sold in shares and, in fact, the shareholder testified that no minority sale was planned. That situation does not exist here; therefore, husband's intent to sell or retain his shares in Enchanted Forest, Inc., on these facts is irrelevant in determining the propriety of applying a discount to the value of his interest in the corporation.

In determining the fair market value of an interest in a closely held corporation, our inquiry focuses on the price that the hypothetical willing buyer would pay the hypothetical willing seller. *Kingery v. Dept. of Revenue*, 276 Or 241, 249, 554 P2d 471 (1976). Because a readily defined market for the shares of a closely held corporation generally does not

---

[5] We are mindful of the fact that both *Barlow* and *Webber and Webber*, 102 Or App 93, 792 P2d 484, *rev den* 310 Or 282 (1990), have been construed by practitioners as establishing a requirement that there be evidence of a prospective sale to justify application of a marketability and/or minority discount to the value of a closely held corporation's shares. We do not agree with that broad interpretation and emphasize that valuation is a fact-based analysis necessarily taken on a case-by-case basis. As we noted in *Barlow*:

"Factual evaluations under principles of equity often bring about what appear to be inconsistent results, when the results are misunderstood as turning on fixed legal principles rather than the different facts in different cases." 111 Or App at 182.

exist, those shares are usually worth less than shares of a publicly traded corporation:

"Ready marketability definitely adds value to a security, or conversely, lack of marketability detracts from the security's value vis-a-vis one that is otherwise comparable but readily marketable. In other words, the market pays a premium for marketability, or, conversely, exacts a discount for lack of it.

"\* \* \* \* \*

"Since interests in closely held businesses do not, by definition, enjoy the ready market of a publicly traded stock, a share in a privately held company is usually worth less than an otherwise comparable share in a publicly held one." Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 23 (2d ed 1989).

The evidence in this case supports the application of a discount to husband's shares. Husband's expert testified:

"To arrive at the fair market value of the shares held by [husband], a discount to the publicly traded equivalent price must be applied to recognize the lack of marketability of these shares. A major difference between Enchanted Forest's shares and those of comparable publicly traded companies is the lack of marketability. All other things being equal, the value of an interest in a business is worth more if the interest is easily marketable and, conversely, worth less if it is not marketable. It is our opinion that the appropriate discount to reflect the lack of marketability is 35 percent."

Both experts agreed about the basic principle behind marketability discounts, but wife's expert testified that a discount would not be appropriate because the yearly return to Enchanted Forest, Inc.'s, stockholders, in the form of annual bonuses, adequately compensates for lack of marketability. He explained that the distribution of profit bonuses enables a shareholder "to get a cash return on the stock without having to sell the stock," thus eliminating the need for a marketability discount. But in this case, the record shows that, although husband received regular bonuses, they bore no relation to the number of shares he held. In fact, at least one of the shareholders received no bonuses, and among those who did receive them, the amount was not determined by the number of shares they held. Moreover, employees who were not shareholders also received substantial bonuses.

Accordingly, the bonus cannot be regarded as a direct return on the shares of stock, and the sole basis for wife's expert's opinion regarding the inappropriateness of a marketability discount fails.[6] Based on the evidence in this record, we conclude that the trial court properly applied a marketability discount to the value of husband's shares in Enchanted Forest, Inc.

■ As for the remaining property distribution issues, we will not consider wife's argument that husband's 1993 bonus should be viewed as property to be divided equally between the parties because of our decision that the bonus must be considered part of husband's gross income. We also conclude that the trial court properly characterized the parties' $36,000 debt to husband's parents as a marital debt.

Reversed and remanded for reconsideration of child support and for entry of modified judgment awarding wife spousal support of $1,300 per month for a period of 60 months commencing March 10, 1994, and then $800 per month indefinitely, and eliminating portion of judgment awarding wife a percentage of future bonuses as spousal support; otherwise affirmed. No costs to either party.

---

[6] In fact, wife's expert acknowledged that "if [Enchanted Forest] quit paying the bonuses * * * [y]ou would have to put a discount down on this stock."