Argued and submitted December 3, 2003, affirmed on appeal and cross-appeal March 10, appellant-cross-respondent's petition for reconsideration filed March 24 and respondent-cross-appellant's response to petition for reconsideration filed March 31 allowed by opinion April 28, 2004
See 193 Or App 246, 89 P3d 1226 (2004)

In the Matter of the Marriage of

Vicky Marie HANSON,
*Respondent - Cross-Appellant,*

*and*

Niles Eugene HANSON,
*Appellant - Cross-Respondent.*

15-00-16750; A114572

86 P3d 94

William G. Wheatley argued the cause for appellant - cross-respondent. With him on the briefs were Debra E. Pilcher and Jaqua & Wheatley, P.C.

Martha L. Walters argued the cause for respondent - cross-appellant. With her on the briefs were David Dickens, Jacquelyn Romm, and Walters Romm Chanti & Dickens, P.C.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Husband appeals, and wife cross-appeals, from a judgment of dissolution of marriage. Husband raises a variety of assignments of error pertaining to the trial court's valuation of husband's 100 percent ownership in Northwest Stamping, Inc. (NSI), a closely held corporation. Wife's cross-appeal challenges the trial court's valuation of certain aircraft. On *de novo* review, ORS 19.415(3),[1] we reject without discussion most of the parties' contentions and write to address only (1) husband's argument that the trial court erred in failing to apply a marketability discount in valuing husband's interest in NSI, and (2) wife's argument that the court erred in assigning a negative valuation, because of tax consequences, to two aircraft that husband purportedly intends to sell. As described below, we reject both arguments and, consequently, affirm on both the appeal and the cross-appeal.

The parties were married in California in 1979 and have two children. In 1991, they moved to Oregon and purchased NSI, a subchapter S corporation, for $1.4 million. NSI designs and manufactures components, using precision stamping and machinery, for customers engaged in the electronics, automotive, medical, aerospace, high-tech, and robotics industries. Husband became, and remains, the sole stockholder, president, and secretary of the corporation. By 1998 NSI owned two airplanes, and husband, who is a licensed pilot, owned two others. The parties separated in early 1999 and jointly hired William Mason, an expert in business valuation, to assess NSI's fair market value. Mason appraised NSI's fair market value, as of September 30, 1999, at $6.9 million.

In August 2000, wife filed for dissolution. She retained two experts to appraise NSI, Mason and Donna Walker. Husband engaged William Holmer as his valuation expert. Mason, Walker, and Holmer each prepared reports

---

[1] The 2003 legislature passed House Bill (HB) 2646, amending ORS 19.415. Or Laws 2003, ch 576, § 88. However, because the judgment on appeal was entered before the effective date of HB 2646, those amendments do not apply here. Or Laws 2003, ch 576, § 90a.

and testified at trial as to NSI's fair market value, using a combination of the capitalization of earnings (income) approach and the comparable transactions (market) approach. Employing those methods, Mason valued NSI at $5.7 million as of December 31, 2000; Walker valued NSI at $5.9 million as of February 2001; and Holmer valued NSI at $3,646,731 as of December 31, 2000. In arriving at their valuations, Mason and Walker did not apply a marketability discount. Conversely, Holmer applied a 25 percent marketability discount.

The parties also presented evidence regarding the valuation of various aircraft, including a Piper Malibu and a Cessna CitationJet. As described below in our discussion of wife's second assignment of error on cross-appeal, much of that testimony pertained to husband's plans to retain, sell, or exchange those aircraft, and the valuation- and tax-related implications of such actions.

Ultimately, the trial court adopted Mason's valuation of NSI, emphasizing that the "nature and quality" of Mason's testimony was the "most credible." In a comprehensive letter opinion, the court stated:

"Despite the able arguments of Respondent's counsel, I find that a marketability discount is not appropriate in this particular case. I have carefully reviewed all of the cases cited by counsel on this and all other issues. Particularly with regard to the argument that the Court of Appeals in *Tofte and Tofte*, 134 Or App 449[, 895 P2d 1387] (1995) mandates that a marketability discount be applied to all controlling interests of non-publicly traded companies, I reject that argument. The passage cited is in a footnote and the case involved a *minority* interest, not a majority interest. That this topic is hotly debated is clear from the record in this case. I heard a great deal of testimony on the subject and read and reviewed all of the exhibits and cases cited and I have come to the conclusion that in this case Mr. Mason's reasoning is correct, a finding also supported by Ms. Walker's testimony. I base this finding on all of the testimony, exhibits and arguments heard on this subject."

(Emphasis in original.) The trial court also credited husband's testimony that he "is going to sell the Piper Malibu

and Cessna Citation" and, because of tax consequences associated with the sale of those aircraft, *see* 192 Or App at 430-31, concluded that "the net to [husband] after sale of those aircraft is a tax liability of $276,000.00."

In April 2001, the court filed its dissolution judgment. As pertinent to the issues that we address, that judgment included a division of property predicated on the court's valuation of NSI and the disputed aircraft that, *inter alia*, awarded husband NSI and awarded wife a substantial equalizing judgment.

■ On appeal, husband contends that the trial court's failure to apply a marketability discount to NSI was erroneous for either of two reasons. First, husband asserts that the trial court erroneously concluded that a marketability discount should *never* apply when valuing a majority interest in a business. Husband contends that such an absolutely preclusive approach contradicts our treatment of marketability discounts in *Tofte*. Second, in all events, husband asserts that the facts presented here required the application of a marketability discount.

Husband misconstrues the trial court's reasoning. As amplified below, the court did not hold that a marketability discount can *never* be applied—only that, in the circumstances of this case, such a discount would be improper. The trial court was correct in that conclusion.

■ The measure of the fair market value of an interest in a closely held business is "the price that the hypothetical willing buyer would pay the hypothetical willing seller." *Tofte*, 134 Or App at 457. In determining that value, an appraiser may, when appropriate, apply a marketability discount. As we explained in *Tofte*:

> "[A] marketability discount addresses the *degree of liquidity* of the interest. Such discounts compensate for the lack of a recognized market for a particular stock, lack of ready marketability, or restrictive provisions affecting ownership rights or limiting sale. A marketability discount may apply to either a minority *or* majority interest, and may be imposed in addition to a minority discount if circumstances warrant. Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 59 (2d

ed 1989); W. Terrance Schreier and O. Maurice Joy, *Judicial Valuation of 'Close' Corporation Stock: Alice in Wonderland Revisited*, 31 Okla L Rev 853 (1978)."

134 Or App at 456 n 3 (emphasis in original). Thus, a marketability discount is appropriate when the valuation fails to otherwise take into account the fact that the interest cannot be quickly and certainly "converted to cash at the owner's discretion." Pratt, *Valuing a Business* at 59. "Since a discount for lack of marketability reflects lack of liquidity, the base from which the discount is subtracted is the value of an entity or interest that is otherwise comparable but enjoys higher liquidity." *Id.* at 59-60.[2]

In *Tofte*, the wife challenged the trial court's application of a 35 percent marketability discount to the husband's minority interest in a family-owned amusement park. *Tofte*, 134 Or App at 455. We affirmed the trial court's decision, explaining that, "[b]ecause a readily defined market for the shares of a closely held corporation generally does not exist, those shares are usually worth less than shares of a publicly traded corporation." *Id.* at 457-58. As support, we quoted Pratt:

> " 'Ready marketability definitely adds value to a security, or conversely, lack of marketability detracts from the security's value vis-a-vis one that is otherwise comparable but readily marketable. In other words, the market pays a premium for marketability, or, conversely, exacts a discount for lack of it.
>
> " '* * * * *
>
> " 'Since interests in closely held businesses do not, by definition, enjoy the ready market of a publicly traded stock, a share in a privately held company is usually worth less than an otherwise comparable share in a publicly held one.' "

---

[2] We noted in *Tofte* the "confusion that exists when distinguishing, or, in most cases, failing to distinguish," between a marketability discount and a minority interest discount. 134 Or App at 456 n 3. A minority interest discount considers the "relationship between the interest being valued and the total enterprise" or, in other words, the *"degree of control* that the owner either does or does not have within the corporation." *Id.* (emphasis in original). Because husband is the sole stockholder in NSI, we are not confronted with whether a minority interest discount, as distinct from a marketability discount, is appropriate in this case.

*Tofte,* 134 Or App at 458 (quoting Pratt, *Valuing a Business* at 23).

Husband's contention that *Tofte mandates* application of a marketability discount is incorrect. Rather, in that case we recognized that a marketability discount *"may* apply" to the valuation of either a minority or majority interest. *Id.* at 456 n 3 (emphasis added). The application of such a discount in *Tofte* itself was appropriate because, in determining the fair market value of the closely held interest there, the husband's expert compared the husband's minority interest in the amusement park to a *"publicly traded* equivalent price." *Id.* at 458 (internal quotation marks omitted; emphasis added).[3] It was that evidence—the use of publicly traded comparables—that we identified as justifying a discount in that case:

> "A major difference between [the amusement park's] shares and those of comparable *publicly traded companies* is the lack of marketability. All other things being equal, the value of an interest in a business is worth more if the interest is easily marketable and, conversely, worth less if it is not marketable."

*Id.* (internal quotation marks omitted; emphasis added).

The critical distinction between this case and *Tofte* is that, while the expert in *Tofte* compared the amusement park—a privately held company—to comparable *publicly* traded companies, in this case all three experts compared NSI—a privately held company—to other comparable *privately* held companies. That is, while the valuation in *Tofte* was based on a comparison of "apples" and "oranges" (in terms of marketability), the expert valuations here were based on a comparison of a privately held "apple" (NSI) with

---

[3] As noted, the experts who valued NSI used two primary approaches. The capitalization of earnings approach, also used by the husband's expert in *Tofte, see* 134 Or App at 455, attempts to determine a business's "normalized" level of earnings, and then, using information from other comparable companies, formulates a multiple, or capitalization rate. The comparable transactions approach assesses transactions in comparable businesses and applies the multiples used in those transactions to the corresponding values in the subject company to estimate a value. Both of the approaches, thus, compare the subject company—here, NSI—to other "like" companies in order to arrive at an estimated fair market value.

other privately held "apples." In substance, the experts' valuations in this case already accounted for the lack of marketability of husband's 100 percent ownership interest in NSI. Consequently, no adjustment for differences in marketability was necessary or proper.

With that understanding, we return to the trial court's treatment of the marketability discount issue. As noted, husband asserts that the trial court held that a marketability discount can never be applied. We disagree that the court so held. It is true that the court adopted Mason's expert testimony as "correct" with respect to whether a marketability discount should be applied to the valuation of NSI; it is also true, as husband emphasizes, that Mason adhered to the view that a marketability discount should never apply to the valuation of a majority interest in a privately held corporation. However, the trial court did not adopt Mason's absolutist approach. Rather, the court merely, and correctly, rejected husband's argument that *Tofte "mandates* that a marketability discount be applied to *all* controlling interests of non-publicly traded companies" and concluded that "a marketability discount is not appropriate *in this particular case*." (Emphasis added.) The court explicitly based its rejection of a marketability discount on the circumstances of this case. Nothing more.

On *de novo* review, we agree with the trial court that Mason's valuation of NSI, as corroborated by Walker's, is persuasive. Moreover, and particularly for the reasons that we have previously described, we agree that, given the bases of the experts' valuation testimony, a marketability discount is inapposite here. Accordingly, we affirm the trial court's determination as to NSI's valuation and affirm on appeal.

■ We proceed, briefly, to wife's second assignment of error on cross-appeal, which challenges the court's valuation of the Cessna CitationJet and the Piper Malibu owned by NSI. In particular, wife challenges the trial court's acceptance of husband's testimony that he intends to sell those aircraft, resulting in adverse tax consequences. *See generally* ORS 107.105(2) (evidence of any tax consequence to a party may be considered in determining the proper division of property in a dissolution). Wife asserts that that testimony was

innately not credible and, in all events, that the putative sale and tax consequences were so speculative that they should not affect the division of the parties' property.

The material facts are as follows: As noted above, NSI owns a Piper Malibu and a Cessna CitationJet, and husband, privately, owns two other airplanes. On numerous occasions over the past decade, NSI has traded in older airplanes for newer ones, concluding like-kind exchanges for tax purposes. By upgrading in that fashion, NSI avoided aircraft depreciation recapture tax liability.

At the time of trial, husband had made a $50,000 down payment for a new Citation, which was due to be delivered no earlier than 18 months later. At his deposition, less than two weeks before trial, husband confirmed that he had no plans to sell the CitationJet or the Piper Malibu. However, on March 2, 2001, four days before trial, husband reversed course and signed a listing agreement with an airplane dealer, putting the two airplanes on the market for sale. At trial, husband testified that he intends to sell the airplanes. Other testimony at trial established that that sale would cause NSI to incur depreciation recapture tax liability of $276,000. Conversely, if, as in the past, NSI kept the aircraft and "traded up," such liability would not be incurred. The trial court credited husband's testimony that he intends to sell the airplanes without a like-kind exchange, triggering the tax liability, and valued the aircraft accordingly.

Wife, as noted, asserts that, in the totality of the circumstances, husband's testimony was not credible and that the trial court erred in finding otherwise. Similarly, wife contends that the tax consequences of the putative sale are so speculative that they should not affect the valuation of the aircraft and the division of the parties' property. Wife invokes several of our decisions, the most recent of which was *Bidwell and Bidwell*, 170 Or App 239, 12 P3d 76 (2000), *adh'd to on recons*, 172 Or App 292, 18 P3d 465, *rev den*, 332 Or 305 (2001), in which we have addressed the proper treatment of putative sales of marital assets. *See id.* at 244 ("Where the amount of tax consequence or the potential for tax liability is too speculative, we will not take into account the possible effects of taxation in dividing the property. * * * We also have

consistently refused to consider the tax consequences of the sale of a marital asset unless there is evidence that a sale is contemplated or reasonably certain to occur.").

We agree that husband's eleventh-hour decision to list the aircraft for sale raises concerns about his motivation and good faith. Nevertheless, given the totality of NSI's and the parties' circumstances, sale of the aircraft is not objectively unreasonable—and, indeed, as the trial court necessarily determined, that sale is reasonably certain to occur. Testimony at trial established that NSI's business is in sharp decline and that, from an operational perspective, the decision to sell the airplanes and incur the tax liability—when weighed against the cost of maintenance and continued principal and interest payments—is justifiable. Further, there was evidence that a year before trial (and long before his deposition testimony) husband had, in fact, discussed with Mason the possibility of selling the aircraft. In that regard, we note that Mason's valuation of NSI, prepared for wife, did not factor in the value of the airplanes because Mason did not consider them as operating assets.

Finally, as to whether the putative sale was, and is, merely a cynical ploy on husband's part, the trial judge—who observed husband under cross-examination and was well aware of his reversal of position—explicitly found that "the sale of the aircraft is clearly contemplated" and that husband "is going to sell" the aircraft. The court, thus, necessarily believed that aspect of husband's testimony. We give "great weight" to that credibility determination, *Tofte*, 134 Or App at 455, and, given the totality of the evidence pertaining to the putative sale and tax consequences, we affirm the trial court's determination as to the value of the Cessna CitationJet and the Piper Malibu.

Affirmed on appeal and cross-appeal.