Argued and submitted December 2, 2004, on appeal and cross-appeal, judgment modified to: (1) provide indefinite spousal support to wife of $2,500 per month after husband no longer has child support obligations; (2) require husband to provide to wife certified copies of his tax returns for five years following dissolution; and (3) provide wife an equalizing judgment of $136,836; otherwise affirmed
June 15, 2005

Susan Janine MALLORIE,
*Appellant - Cross-Respondent,*

*and*

Richard Willis MALLORIE,
*Respondent - Cross-Appellant.*

01C-31171; A120473

113 P3d 924

Mark Johnson argued the cause for appellant - cross-respondent. With him on the briefs was Johnson Renshaw & Lechman-Su PC.

Craig Wymetalek argued the cause for respondent - cross-appellant. With him on the brief was Stahancyk, Gearing, Rackner & Kent, P.C.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

HASELTON, P. J.

**HASELTON, P. J.** °

Wife appeals and husband cross-appeals from a judgment of dissolution of marriage. Wife asserts that the trial court erred in making its award of spousal support, in treating a large number of cows leased to the family's dairy as husband's premarital assets, in treating wife's wedding ring as a marital asset, and in taking into consideration certain alleged tax ramifications of a business arrangement with the family's dairy in setting wife's spousal support and in valuing husband's cows. On cross-appeal, husband takes issue with the trial court's determination that a pickup truck was a marital asset, its treatment of a $10,000 loan to wife by her sister as a marital debt, and the court's award of attorney fees to wife.

Our review is *de novo*. ORS 19.415(3) (2001). As explained below, with respect to the appeal, we modify the property division of the judgment to reflect that 362 cows that the trial court treated as husband's premarital assets are marital assets and that wife's wedding ring is not a marital asset. With respect to the property division issues on cross-appeal, we conclude that husband's pickup is a marital asset but that wife's debt to her sister is not a marital debt. In light of our conclusions about the disputed assets and debts, we modify the distribution of both assets and debts in accordance with the attached summary and increase the equalizing judgment in favor of wife from $52,656 to $136,836. Further, on the appeal, we modify the trial court's award of spousal support of $2,500 per month to wife, which was to terminate after eight years under the original judgment, to an indefinite award of spousal support in the amount of $2,500 per month. Finally, we reject without discussion husband's arguments concerning attorney fees.

The material facts are as follows. Husband and wife were married for 20 years. Husband is the president of Mallorie's Dairy, a family dairy operation that was started by his parents. Husband has a high school education and has worked for the family's dairy throughout his adult life. At the time of trial, husband's salary was $5,083 per month, and he received an additional $3,856 per month as income from his

lease of cows to the dairy, described more fully below. Husband's salary is well below what most people in similar positions make, but husband also receives numerous benefits from his employment at the family dairy, including use of telephones and vehicles, vehicle maintenance and lawn care, use of recreational facilities, and free meat and dairy products.[1]

Wife also has a high school education and took several college courses before her marriage to husband in the early 1980s. Early in the marriage, wife assisted in repairing and cleaning properties owned by the dairy or other related family-owned companies. At the time of trial, wife was working for a school district, providing assistance to special education students, and earned $1,032 per month. Wife has scoliosis and has suffered several injuries to her back.

The couple has two children, aged 19 and 17 at the time of trial. Wife became a full-time homemaker after the children were born. The older child, a son, has Asperger's Syndrome, an autism spectrum disorder, and attends a special high school completion program at a community college. The younger child, a daughter, attends high school.

Wife has always been the primary caretaker of the children. Wife testified that son has serious difficulties due to his special needs. He requires a significant amount of supervision, as well as assistance from wife in getting up and ready for school, and in grooming and personal hygiene. Son and husband have historically had an extremely volatile and violent relationship, and husband has no contact at all with son. While wife expects son to complete his high school education at the special program he attends, she also expects to have an ongoing obligation to provide care and supervision for son throughout his life.[2] The parties agreed that they would have

---

[1] As noted, one of husband's assignments of error disputes the trial court's characterization of a 1997 pickup as a marital asset. That pickup is registered jointly to husband and the dairy. Wife testified that the dairy bought the pickup for husband in lieu of a pay raise. She believed that the arrangement was that the pickup would be registered in the dairy's name as well as husband's name until it was paid off and then transferred into husband's name. Husband testified that he discussed a raise with his mother, the majority stockholder in the dairy, and said, "instead of a raise, I'd rather the dairy is able to buy me a new pickup to drive, and they did." The dairy lists the pickup as an asset on its books.

[2] The son's need for close supervision is demonstrated by the fact that, after the parties' separation, wife worked more outside the home and, as a result, left the son

joint custody of daughter, who would reside with wife and who could see husband as she wished.[3]

The parties own a large house on 44 acres of land close to the dairy. The parties agreed in the present proceeding that the property is worth about three quarters of a million dollars and needs to be sold. The trial court's judgment provided that the proceeds from the sale will be divided equally and that aspect of the judgment is not at issue on appeal. After the parties separated, wife moved into a rental unit with the children that costs $850 per month. Husband and his girlfriend moved into a residence purchased for his use by the dairy for approximately three quarters of a million dollars and rented to husband for $650 per month.

Most of the assets at issue on appeal are dairy-related—that is, they involve the dairy and a related family-owned business, Cow Hop, that rents land to the dairy.[4] Before the marriage, husband owned 362 cows, which he leased to the dairy, and approximately 16 percent of the stock in Cow Hop. During the marriage, husband acquired an additional 120 cows, and wife acquired 11 cows. Those cows also were leased to the dairy. Because the particulars of the cow lease arrangement are so significant to our analysis of certain property division issues, we recount the terms and operation of that arrangement in detail.

The lease agreements pertaining to all of the cows are identical.[5] The dairy pays the cows' owners $8 per cow per month. In return, the dairy is entitled to all milk products and calves produced by the cows. If a cow dies, is sold, or is otherwise disposed of by the dairy, the dairy provides a replacement cow with a value of $900. Either party may terminate the lease at any time by providing written notice, and the dairy has the option of purchasing the cows at any time at the price of $900 per cow.

---

unattended. While unattended, the son committed criminal acts against two neighbor children.

[3] At the time of trial, daughter also chose to have no contact with husband.

[4] Both parties own stock in the dairy. No issue is presented on appeal as to the trial court's valuation and disposition of the stock.

[5] In fact, all of the dairy's cows are leased in the same manner from various members of husband's extended family.

Evidence at trial established that, throughout the parties' marriage, the dairy replaced each leased cow on a cycle or rotation of approximately every three years, which corresponded to the cow's period of optimum milk productivity. Thus, as each cow's period of peak productivity ended, she would be sold off or butchered and replaced with a younger, higher producing cow. In sum, the original 362 cows that husband owned at the time of the marriage were replaced at the dairy's expense pursuant to the lease and their replacements were then repeatedly replaced over the course of the marriage.

At trial, husband produced expert testimony by an accountant, Ranweiler, that each time a cow was replaced by the dairy pursuant to the lease, it should have been treated as an income-producing taxable event by the cow's owner. Husband and wife, on their joint tax returns, had not treated the replacement of the cows pursuant to the lease as generating taxable income. Ranweiler explained that, in light of several tax cases that have been decided concerning similar lease arrangements, the parties could face significant tax liability and penalties for the three tax years that were still "open" at the time of trial, should their tax returns be audited.[6] He further opined that, if husband (who was awarded all of the cows in the present proceeding) voluntarily changed his accounting method, he could probably reach an agreement with the Internal Revenue Service whereby he could avoid penalties and spread the payment of the three years of back taxes owed over the next four years.

Ranweiler's accounting firm estimated that the under-reported income plus penalties from the three "open" years could be more than $200,000 but that penalties could be avoided if the parties voluntarily changed accounting

---

[6] In its written opinion, the accounting firm stated:

"Under the present arrangement, the lease owners have a no-risk perpetual income stream from the lease of a very limited life asset. * * * Under the Mallorie lease, for a one-time investment in an existing herd of cows, the lessors would receive a perpetual income stream without any of the burdens of replacement of the asset. This point was clearly part of the rationale in [several reported tax cases involving similar leases], as the court pointed out that the tenant's transfer of replacement animals to the landlord had significant value that must be recognized for tax purposes."

methods and, if that occurred, past tax liability could be spread equally over the tax years 2002 through 2005. Ranweiler explained that, if the accounting method were changed, husband could begin depreciating the cows and ultimately the depreciation of the cows would significantly reduce the tax liability in future years. In his estimate, the total federal and state tax liability on cows for the years 1999, 2000, and 2001 would be around $132,000.

On cross-examination, Ranweiler admitted that his predictions of the tax consequences were speculative but constituted his "best estimate." He also acknowledged that his estimates did not take into account the fact that the older cows are sold by the dairy when they are replaced with younger cows: his estimates appear to assign no value to the cows sold or butchered by the dairy, whereas evidence at trial indicated that at least some cows culled from the herd were sold for more than $500. Husband testified at trial that he felt that the tax situation "needs to be dealt with" and that he would like to follow the accountant's advice and change accounting methods.

As pertinent to the issue raised on appeal, the trial court's dissolution judgment treated 362 cows as husband's premarital assets and 131 cows as marital assets, awarding all cows to husband. The court valued each cow at $900, for a total value of $325,800 on the cows that the court treated as husband's premarital assets, and a total value of $117,900 for the cows that the court treated as marital assets. The court also, however, offset those values by estimated tax liabilities for the replacement cows, setting tax liability for the marital-asset cows at $28,034, and for the premarital-asset cows at $98,168. The trial court also included in its judgment a determination that husband would be liable for any taxes and penalties arising out of any joint tax return that the parties had filed during the marriage. Also, as part of its property division, the trial court treated wife's wedding ring as a marital asset valued at $8,320 and awarded it to wife. In addition, the court treated a $10,000 debt to wife's sister as a marital debt and assigned it to wife. The court treated husband's interest in Cow Hop as a premarital asset and awarded it to husband. And the court treated the 1997 pickup registered to husband and the dairy as a marital asset and awarded it to husband.

Finally, the trial court awarded spousal support to wife in the amount of $1,000 per month until the sale of the parties' residence, to be increased to $2,000 per month thereafter, and further increased by $250 per month after each child ceases to be eligible to receive child support. The spousal support was to terminate after eight years. The judgment further provides:

> "An award of spousal maintenance is appropriate as said term is defined in ORS 107.105(1)(d)(C). The award recognizes the duration of the parties' marriage, their ages, the standard of living established during the marriage, Husband's superior actual and potential earning capacity, Wife's lack of work experience caused by the family's decision that she should stay home to raise the parties' children and act as the traditional homemaker, the tax consequences of the award of support and Wife's health issues relating to her back. The award of spousal support would have been higher but for Husband's representation that he will owe a substantial amount of 'cow tax' as a result of the way that the lease agreement between [him] and Mallorie's Dairy, Inc. is going to be treated for tax purposes. This court will consider a request to increase Husband's spousal support obligation to Wife should Husband not actually pay that tax or if the tax is paid but not at the substantial level that Husband has represented to the court what the tax will be."

We turn first to wife's assignment of error pertaining to the trial court's treatment of husband's interest in Cow Hop and 362 cows as premarital assets. ORS 107.105(1)(f) provides, in part, that a court may provide in a judgment of dissolution:

> "For the division or other disposition between the parties of the real or personal property, or both, of either or both of the parties as may be just and proper in all the circumstances. * * *. The court shall consider the contribution of a spouse as a homemaker as a contribution to the acquisition of marital assets. There is a rebuttable presumption that both spouses have contributed equally to the acquisition of property during the marriage, whether such property is jointly or separately held."

That statute gives the trial court the authority to divide all property of the parties, regardless of whether it was

acquired during the marriage. We use the term "marital property" to refer to all of the assets of both parties, regardless of when acquired. However, property acquired during the marriage, or "marital assets," are subject to the rebuttable presumption that "both spouses have contributed equally to the[ir] acquisition[.]" Appreciation during the marriage of property brought into the marriage by one spouse also is a marital asset. *Massee and Massee*, 328 Or 195, 197, 970 P2d 1203 (1999).

Husband maintains, and the trial court agreed, that the 362 cows that husband brought into the marriage, although long since dead, were replaced during the marriage by cows that should not be treated as "property acquired during the marriage." Husband reasons that what he brought into the marriage was not 362 *specific* cows, but was, instead, 362 income-producing items that were to be replaced regularly by the dairy pursuant to the lease. In essence, husband argues that he brought to the marriage 362 perpetual cows rather than 362 mortal cows. He likens his interest to the holdings in a mutual fund acquired before marriage, noting that the selling of one stock and the buying of another by the fund's manager during the marriage would not convert the mutual fund into a marital asset.

We reject husband's characterization of the cows for two reasons. First, we do not view the combination of the 362 cows and the lease as representing the equivalent of "perpetual cows." The lease, as noted, is, and always has been, terminable at will by either party and cannot be viewed as a premarital guarantee by the dairy to husband of perpetual cow replacement throughout the marriage—or indeed for any specific term at all. That is, although, as events transpired, the lease did, in fact, operate throughout the marriage to confer benefits on husband, it never (either at the time of the marriage or thereafter) provided any *guarantee* of such benefits because the dairy could have terminated it at any time and stopped replacing the cows. As such, the lease arrangement itself had only speculative value as a long-term asset.

The other flaw with husband's position is demonstrated by husband's own expert's testimony. We find convincing Ranweiler's conclusion that, every time one of the

cows was replaced by the dairy, the cow's owner received a benefit. As noted, Ranweiler opined that the cow leases, as structured, gave husband and other family members a "no-risk perpetual income stream." *See* 200 Or App at 209 n 6. By setting up the leases in that manner, the dairy's transfer of replacement animals to husband during the marriage "had significant value that must be recognized for tax purposes." *Id.* That is, each time during the marriage that an old cow was replaced with a new cow of greater value, a benefit was conferred on the owner of the cow *at that time*.

We do not view this situation as akin to ownership of a mutual fund that has not appreciated and from which no withdrawals are made through a marriage. Livestock and corporate stock simply are not equivalent. Dairy cattle live and die; shares of stock don't. Thus, a dairy cow, like produce, is a "consumable" commodity—she has a finite productive life, with her value inexorably decreasing, rather than increasing or remaining static, with the passage of time over her productive life. That value is a function of the cow's projected remaining production capacity. But once the cow is dead, she's dead. In sum, the cows that husband brought into the marriage are long gone. They have no residual value that lasted in perpetuity or even throughout a 20-year marriage, despite the existence of a lease that provided for the replacement of the cows at no cost to husband. The successive generations of replacement cows generated the stream of rental income and that income was used throughout the marriage by the family.

Perhaps ironically, given the distinctions we have just highlighted, our treatment of stock in *Olinger and Olinger*, 75 Or App 351, 707 P2d 64, *rev den*, 300 Or 367 (1985), is also instructive. In that case, the husband owned stock in a family-held corporation at the time of the marriage. During the marriage, he acquired interests in two additional corporations, primarily by taking out loans from the first corporation but also by using funds in the parties' joint account into which his salary was deposited. *Id.* at 353. The trial court concluded that the husband's interests in the two additional corporations were not marital assets. We disagreed. We noted that each spouse is entitled to share in property that is acquired during the marriage, as well as to increases

in value of property acquired before the marriage. *Id.* at 354. We further rejected the husband's argument that he had overcome the presumption of equal contribution:

> "The fact that husband's salary came in part from a dealership which he owned before the marriage does not lessen the fact that it was family income. Neither does the fact that husband, because of his business success, contributed a greater share to the joint account make it necessary to ascribe to him a greater share of assets purchased from that account."

*Id.* at 355. We concluded that the increase in value of the original corporation, as well as the entire value of the stock in the new corporations acquired during marriage, were marital assets. *Id.* at 356.

This case is analogous. The original (and mortal) cows that husband brought into the marriage, like the original corporation at issue in *Olinger*, contributed to the acquisition of additional assets during the marriage, due to the husbands' various lucrative business arrangements with family-held corporations for which they worked. Those premarital assets were parlayed during the marriage into new, different, and more valuable assets, but that does not mean that the new assets should be treated as premarital assets, particularly where, as here, the income produced by both the original and the new assets was used as part of the family's income stream throughout the marriage.

The Oregon Supreme Court most recently addressed the proper identification and apportionment of premarital assets and marital assets in *Kunze and Kunze*, 337 Or 122, 143-46, 92 P3d 100 (2004). In *Kunze*, the wife owned several pieces of property before marriage and received as inheritance during the marriage several additional properties. Several of the inherited properties were sold, with the proceeds being used to finance the parties' purchase of additional properties. At the dissolution proceeding, the husband asserted that the court should divide all of the parties' real estate holdings equally. The wife agreed that some of the properties should be divided equally but maintained that a number of the properties should be treated as her separate property. *Id.* at 127-29.

The Supreme Court ultimately agreed with the wife that her premarital equity in one of the properties should be considered her separate property, as well as the only inherited property that had not been sold. 337 Or at 131. The wife had sold the other inherited properties and used the proceeds to purchase the "Chaps Court" property, which the parties held in tenancy by the entirety. *Id.* at 127. The court held that the trial court had erred in awarding the Chaps Court property to the wife as her separate property because the "wife had converted that asset to a joint asset of the marital partnership through commingling." *Id.* at 131. The court stated:

> "Although ORS 107.105(1)(f) does not require the court to undertake the task of tracing the parties' respective contributions when commingling has made the identification of those contributions unreliable, the fact that a party has commingled a separately acquired asset with the shared finances of the marital partnership does not create that difficulty in all circumstances. However, even if acts of commingling do not preclude the court from identifying the source of a disputed asset with sufficient reliability, the integration of a separately acquired asset into the parties' joint financial affairs through commingling may require the inclusion of that asset in the property division for a different reason. Specifically, as discussed below, acts of commingling may operate to convert a separately acquired asset into a joint asset of the marital partnership."

*Id.* at 139 (footnote omitted).

Under *Kunze*, even if we were to accept husband's premise that he brought into the marriage "perpetual" rather than "mortal" cows, we would reach the conclusion that the cows, at the time of the dissolution, were a marital asset because of commingling. As noted, the parties, between them, owned a total of almost 500 cows, which they leased to the dairy. Those owned by husband were not in any way kept separate from the remainder of the cows; all the cows were treated the same by both the dairy and the parties. The rent paid to the parties for the use of those cows—and, according to husband's own expert, also the replacement of those cows by the dairy—produced cognizable income for the marriage partnership throughout the marriage, and in an amount

nearly equal to the parties' salaries. Moreover, that significant amount of income was used by the parties to sustain their lifestyle throughout the marriage. Additionally, the cows themselves produced dairy products and, ultimately, meat that the parties used throughout the marriage. Given those circumstances, it would be extremely difficult, if not impossible, to discern what part, if any, of husband's premarital dairy herd was not integrated into "the parties' joint financial affairs[.]" *Id.*

The cows replaced throughout the marriage were marital assets. Thus, the trial court erred in treating 362 cows owned at the time of the dissolution as husband's premarital property.

Husband also argues, as an alternative basis for affirmance, that he rebutted any presumption of equal contribution regarding the 362 "replacement" cows. The gist of husband's argument is that the cows were segregated from the parties' general finances and remained so throughout the marriage. We disagree. The cows were an integral part of the dairy operation that husband managed and produced a significant amount of income that the family used throughout the marriage, as well as dairy and meat products consumed by the family. Husband did not rebut the presumption of equal contribution.

■    The same analysis, however, does not apply to husband's interest in Cow Hop. There was no evidence that Cow Hop produced any income for husband during the marriage. Wife's sole argument concerning Cow Hop is that, in the first year of the marriage, the couple lived in a run-down trailer on Cow Hop property that she fixed up. There is no evidence that wife's efforts, however, contributed to any appreciation of any Cow Hop asset and, in fact, no evidence that Cow Hop's assets did appreciate during the marriage. We conclude that husband's interest in Cow Hop was properly treated as a premarital asset. *Cf. Kunze*, 337 Or at 143-46 (wife's premarital equity in property remained a premarital asset, although husband was entitled to share in appreciation of property during marriage).

■    We next turn to wife's argument that the trial court erred in assuming that husband would incur tax liability

based on the dairy's replacement of the cows. The trial court assumed that husband would have tax liability for all 493 cows and quantified that liability based on Ranweiler's opinion, described above. Based on Ranweiler's projections of how husband might spread such tax payments over future years, the trial court reduced the $900 value of each cow awarded to husband by $214 based on past tax liability—in essence, treating each cow as being worth $686.

Wife argues that the trial court erred in assuming that husband would be responsible for "cow tax" liability in the amount of $126,202, based on the underreporting of the couple's income in the three years preceding the dissolution. Wife asserts that the income tax consequences of the cow lease arrangement are too speculative and should not have been considered either in the property division or in setting spousal support. Wife acknowledges that the trial court, in dividing property, "shall consider * * * taxes, and any other costs reasonably anticipated by the parties." ORS 107.105(1)(f). Wife asserts that, because the tax obligation is too speculative, it is not "reasonably anticipated" as that term is used in ORS 107.105(1)(f). Additionally, wife disputes the trial court's statement that, should husband "not actually pay the tax," or pay it but "not at the substantial level that Husband has represented to the court," then wife could seek a modification of support. Wife argues that that approach is fundamentally unfair because she will not have the means to discover whether husband does or does not pay the tax. Finally, wife implies that the tax obligation is illusory, suggesting that husband's "discovery" of the "cow tax" liability shortly before the dissolution trial may have been the product of convenience and not coincidence.

■ "Where the amount of tax consequence or the potential for tax liability is too speculative, we will not take into account the possible effects of taxation in dividing the property." *Bidwell and Bidwell*, 170 Or App 239, 244, 12 P3d 76 (2000), *adh'd to on recons*, 172 Or App 292, 18 P3d 465, *rev den*, 332 Or 305 (2001). We do not agree with wife that the tax liability here is either too speculative or illusory. As an initial matter, to the extent that wife suggests that husband created an illusory liability for purposes of the dissolution proceeding, we defer to the trial court's implicit credibility

determination that husband does intend to fulfill his tax obligations. *See Owens-Koenig and Koenig*, 194 Or App 573, 585, 95 P3d 1152, *modified on recons*, 195 Or App 734, 98 P3d 1143 (2004).

To the extent that wife calls into question husband's motivation for raising the tax issue in the context of the dissolution, that is not dispositive. In *Hanson and Hanson*, 192 Or App 422, 431, 86 P3d 94, *adh'd to on recons*, 193 Or App 246, 89 P3d 1226, *rev den*, 337 Or 182 (2004), we noted that the husband's decision to sell certain aircraft and incur tax liability "raise[d] concerns about his motivation and good faith." Nonetheless, we concluded that the sale of the aircraft was "not objectively unreasonable," and thus upheld the trial court's property division. Similarly here, husband's decision to pursue the tax liability issue during dissolution proceedings may reflect on his motivation and good faith but, given that husband's position is based on solid law indicating that the tax consequences are, in fact, not illusory, we conclude that his decision to meet his tax liabilities is "not objectively unreasonable."

Husband's expert based his opinion that the replacement of cows was a taxable event on two cases, *Dudden v. Commissioner of Internal Revenue*, 893 F2d 174 (8th Cir 1990), and *Strong v. Commissioner of Internal Revenue*, 91 TC 627 (1988). Those cases support the expert's conclusion that, in fact, the cow owners realized rental income when the dairy replaced cows pursuant to the lease and that income should have been reported. Thus, we conclude that the tax consequences themselves are not overly speculative. Consequently, the trial court properly took into account husband's tax liability when it established the cows' value.

■     Given that conclusion, we also determine that the trial court properly took into account husband's tax liability in setting the amount of support to be awarded. As to wife's argument that it is unfair to place the burden on her to discover whether or not husband actually pays the taxes, and then move for a modification of support if he does not, we agree with wife that her position is somewhat difficult in that respect. We conclude, however, that that difficulty may be surmounted by modifying the judgment to require husband

to provide to wife certified copies of his tax returns for the five years following the dissolution, from which wife may determine whether husband has paid the taxes to which his expert referred. We reject wife's arguments concerning the amount of support without further discussion.

█ We turn to wife's arguments concerning the duration of support. Wife asserts that the trial court erred in ordering spousal support to terminate after eight years. Wife asserts that, under the circumstances, the spousal support award should be permanent. We agree. ORS 107.105(1)(d)(C) permits a court to award:

"Spousal maintenance as a contribution by one spouse to the support of the other for either a specified or an indefinite period. The factors to be considered by the court in awarding spousal maintenance include but are not limited to:

"(i)     The duration of the marriage;

"(ii)    The age of the parties;

"(iii)   The health of the parties, including their physical, mental and emotional condition;

"(iv)   The standard of living established during the marriage;

"(v)    The relative income and earning capacity of the parties, recognizing that the wage earner's continuing income may be a basis for support distinct from the income that the supported spouse may receive from the distribution of marital property;

"(vi)   A party's training and employment skills;

"(vii)  A party's work experience;

"(viii) The financial needs and resources of each party;

"(ix)   The tax consequences to each party;

"(x)    A party's custodial and child support responsibilities; and

"(xi)   Any other factors the court deems just and equitable."

█ This was a long-term marriage. Spousal support awards in long-term marriages are based on the standard of

living enjoyed by the parties during the marriage. *See, e.g.,* *Howard and Howard,* 103 Or App 171, 174-75, 797 P2d 369 (1990). Here, the evidence showed that, during the later years of the marriage, the parties lived in a large and very attractive house and had income, including husband's salary and rent from the cows, that amounted to approximately $150,000 per year at the end of the marriage. Although husband's income is expected to be temporarily reduced for several years based on the above-described tax liability, his income-producing potential is essentially unaltered: He retains his position as president of the dairy, and he owns a large herd of income-producing cows. Wife, by contrast, received no income-producing assets in the property distribution, has limited training and employment skills, earns less than $20,000 per year, has life-long problems with scoliosis, and has sole responsibility for caring for the parties' adult son with Asperger's Syndrome.

Husband asserts on appeal that wife's obligations toward their son should be disregarded because he is not a "child with special needs" and because there was "no evidence" that wife would continue to be responsible for his care. We disagree. To the extent that husband is implying that his son does not, in fact, have special needs, we reject that argument without discussion. To the extent that husband is suggesting that wife's obligation to son is illusory because son is no longer a "child," it is appropriate to take into account a spouse's obligations toward dependent family members regardless of whether they are minors. *See, e.g., Triperinas and Triperinas,* 185 Or App 283, 290, 59 P3d 586 (2002) (court properly awarded indefinite spousal support in 20-year marriage in light of wife's ongoing need to provide care for disabled son). To the extent that husband asserts that no evidence supports wife's contention that she will actually continue to take responsibility for their son, we disagree. Wife testified that she did not expect their son ever to be able to live independently of her. Husband offered no contradictory evidence.

Wife has spent most of her adult life caring for the parties' son. Consequently, her job skills are limited. Moreover, wife's age, her long-term health problem with scoliosis, and her ongoing obligation to provide care for their son limit

wife's ability and opportunity to retrain in order to increase
her earning potential. In light of those facts, the parties' dis-
parate earning capacities, the standard of living enjoyed by
the parties during the marriage, and the short-term nature of
husband's "cow tax" liability, we conclude that husband's
spousal support obligation should not terminate after eight
years, but should be made indefinite.

■      We turn, finally, to the parties' arguments concern-
ing the trial court's treatment of various smaller assets and
debts. Husband asserts that the parties agreed that a
$10,000 debt incurred by wife to her sister after the parties
separated should not be included as a marital debt and that
the trial court erred in including it as a marital debt. Wife's
only response is, in essence, that the error is *de minimis* and
not worthy of correction. We do not agree that that matter is
*de minimis*—and, in all events, given that we are modifying
the judgment in other respects, we correct that error. We con-
clude that the $10,000 debt to wife's sister should be treated
as wife's separate debt and not as a marital debt.

■      Husband next argues that the trial court erred in
treating the 1997 pickup jointly owned by husband and the
dairy as a marital asset. Husband asserts that he purchased
the pickup while acting as the president of the dairy and as
an asset for the dairy and, therefore, it should not be treated
as a marital asset. He notes that the dairy lists the pickup on
its depreciation schedule. We reject husband's argument.
The pickup is held in both husband's name and in the name
of the dairy. *See* ORS 803.010 ("certificate of title is prima
facie evidence of the ownership of a vehicle or of an interest
therein[.]"). Further, and more significantly, as noted above,
both husband's and wife's testimony indicated that the dairy
purchased the pickup for husband's use in lieu of a salary
increase. Thus, regardless of the fact that the pickup is held
in both husband's and the dairy's names, and regardless of
whether the dairy claims depreciation on the pickup, it may
properly be considered a marital asset because it was pur-
chased for husband in lieu of income during the marriage.

■      Finally, we address wife's argument that the trial
court erred in treating her wedding ring, valued at $8,320, as
a marital asset. Wife asserts that the ring should be treated

either as wife's premarital asset or, because wife was the sole object of husband's donative intent, that it is a marital asset for which she rebutted the presumption of equal contribution. Husband responds that the ring was given to wife "in contemplation of marriage" and also that it "was acquired during the marriage."

The problem with both parties' assertions is that they are not based on anything in the record. Oddly enough, neither party provided any evidence whatsoever as to the circumstances surrounding the acquisition of the ring. That is, there is no direct evidence in the record as to whether the ring was purchased by husband or whether it was given to wife before the wedding, during the wedding, or after the wedding. There is no direct evidence whether husband acquired the ring intending to follow the traditional custom of giving the ring to his bride as a gift or whether he acquired the ring, as he now implies, to be held as a marital asset. Here, the only thing we can infer on this record is that the parties agree that the ring, in fact, has always been treated as "wife's ring."

In light of the limited amount of evidence available, we infer that the ring was a gift received by wife either shortly before or shortly after marriage. We need not determine the precise timing because, as explained below, in either case the ring should have been treated as wife's separate property. If it was received before marriage, it is a premarital asset that should be awarded to wife. Conversely, if it was received during the marriage, it is subject to the rebuttable presumption of equal contribution. However, as we stated in *Tibbetts and Mueller*, 183 Or App 379, 387, 52 P3d 1067 (2002),

> "the presumption under the statute is rebutted when evidence shows that the property was acquired by a gift which was received by one spouse and that the gift was unrelated to the other spouse's efforts *or that the other spouse was not the object of the donative intent*."

(Emphasis added; citation omitted.) If a gift from one spouse to another is an item of personal apparel, such as clothing, jewelry, etc., and uniquely suited to the use of one spouse and

not the other, we may infer that the recipient, and the recipient alone, is the sole object of donative intent, in the absence of evidence to the contrary. We thus conclude that, regardless of when wife acquired her wedding ring, it should have been treated as her separate property rather than as a marital asset.[7]

We thus conclude that the major error in the trial court's distribution of property concerned the designation of 362 cows as husband's premarital property.[8] That is, the trial court treated only 131 cows as marital assets. The trial court should have treated all 493 cows as marital assets, valued at a total of $443,700. It should also have treated all of the cow tax liability as a marital debt in the amount of $126,202.

█  Although unequal distribution of assets certainly is permissible where it is "just and proper," ORS 107.105(1)(f), we find no reason not to divide the parties' property in the present case as equally as possible. As noted, see 200 Or App at 223 n 8, correcting the trial court's erroneous treatment of the debt to wife's sister and the wedding ring will result in, essentially, a "wash." If we were to divide the remaining assets and debts in the same manner as the trial court, we would need to more than triple the equalizing judgment to wife. However, in crafting a property division, we seek to disentangle the parties' finances to the greatest extent possible. See Slauson and Slauson, 29 Or App 177, 183-84, 562 P2d 604 (1977). Towards that end, we deem it appropriate to modify the debt distribution somewhat, to allocate more debt to

---

[7] We note in passing that, although there is no Oregon case law directly on point, courts in other jurisdictions are virtually unanimous in treating rings given "in contemplation of marriage," as husband asserts wife's ring was, as gifts that are the separate property of the recipients. Even when the ring is given during the marriage rather than before the marriage, courts tend to treat such items as gifts that are the separate property of the recipient. See, e.g., Martinez v. Gutierrez-Martinez, 77 P3d 827 (Colo App 2003) (in the absence of evidence that wedding ring given during marriage was intended as an investment rather than a gift, it was properly awarded to wife as separate property); In re Marriage of Kecskes, 210 Mont 479, 683 P2d 478 (1984) (trial court properly treated wedding ring received during marriage as wife's separate property); Melvik and Melvik, 669 So 2d 328 (Fla Dist Ct App 1996) (trial court erred in including wedding ring, which was found to be a gift to wife, in the distribution of marital assets).

[8] The erroneous inclusion of the $10,000 debt to wife's sister as a marital debt was essentially offset by the inclusion of wife's wedding ring ($8,370) as a marital asset.

husband and thereby reduce the amount of the equalizing judgment. One of the parties' marital debts was to the dairy for a loan in the amount of $57,590. The trial court divided that debt equally, assigning $28,795 to husband and $28,795 to wife. We conclude that the entire debt to the dairy should be husband's responsibility. In light of the above alterations in the allocation of assets and liabilities, wife is entitled to an equalizing judgment in the amount of $136,836.

On appeal and cross-appeal, judgment modified to: (1) provide indefinite spousal support to wife of $2,500 per month after husband no longer has child support obligations; (2) require husband to provide to wife certified copies of his tax returns for five years following dissolution; and (3) provide wife an equalizing judgment of $136,836. Otherwise affirmed.