Argued and submitted November 9, 2007, dissolution judgment modified to reduce spousal support to wife to $4,500 per month effective on issuance of final appellate judgment in this case; otherwise affirmed October 15, 2008

## In the Matter of the Marriage of

### Steven Roy CULLEN,
*Petitioner-Appellant,*

*and*

### Sally Ann CULLEN,
*Respondent-Respondent.*

### Clatsop County Circuit Court
043188; A131021

194 P3d 866

Gary J. Zimmer argued the cause for appellant. On the opening brief were Peter Bunch and Zimmer & Bunch LLC. On the reply brief were Angela Bentz and Zimmer & Bunch LLC.

Craig Wymetalek argued the cause for respondent. With him on the brief was Gearing, Rackner & Engel, LLP.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

Husband appeals a judgment of dissolution and assigns error to the amount and duration of the trial court's award of maintenance spousal support to wife. On *de novo* review, ORS 19.415(3), we modify the amount of spousal support and otherwise affirm.

We state the relevant facts from our review of the record. Our findings are consistent with those of the trial court, except where noted. At the time of the dissolution, the parties had been married for 25 years. Husband was 50 years old, and wife was 44 years old; both were in good health. The parties have two daughters who were 15 and 19 years old at the time of the trial. The younger daughter attended high school and resided with wife at the family home; the older daughter was in college.

The parties started Walluski Western, an agricultural equipment business, during the early years of the marriage after husband invented a new way of bagging grass. They later formed Versa Corporation, which markets the equipment. Other corporations own the intellectual property of the business and real properties used by both companies, including the "Bumble Bee Shipyard" property used by Versa. Husband ran the business; wife took care of the books and assisted husband in the operation of the business. However, her primary work for the past 10 years was as a homemaker. Wife has one year of college education; the trial court found that wife could earn $1,200 to $1,500 per month if she entered the job market and that she "has a good eye for land investments."

The business was a success. By the time of trial, both companies were worth $2,128,084. The business generated considerable income for the parties, and they enjoyed a very comfortable lifestyle. The parties owned a spacious home on 26 landscaped acres with stables, a riding arena, and a swimming pool. Their family took expensive trips and vacations. They owned a number of automobiles, motorcycles, recreational vehicles, and show horses, together with approximately nine acres of business property (the gravel pit property), acreage on the Washington coast, a condominium on

the Seaside promenade, and substantial retirement and savings accounts.

The parties received an average annual salary from the companies of $148,298 for the last five years. A majority of that salary was paid to husband. However, the parties also extracted substantial sums of money from those companies for the past 10 years for personal spending and to purchase personal, business, and investment real estate. Those withdrawals stripped most of the retained earnings from the companies. We concur in the following trial court findings:

> "Mr. Fagin [the business manager] and Mr. Conner [the business accountant] are alarmed about the financial health of Walluski Western and indicate cash cannot be taken from the company as the parties have done for the past five years. Both indicate the cash flow must be reduced if Walluski will survive, pay its bills, maintain its equipment and manufacturing ability and continue to develop improvements to its products to stay competitive. [Wife's accountant] did her own analysis of husband and wife's finances which included reviewing the money the parties have been able to draw from the corporations for the past ten years. She agreed the retained earnings have been depleted and based upon the history of the companies, thought that level of withdrawal could continue. After reviewing the exhibits, the tax returns and doing my own averaging of corporate incomes and salaries for the past five years, I believe Mr. Fagin and Mr. Conner have the better feel for the present status of the corporations and their current financial situation. Historically, the parties have had average salaries of $148,298.00 available which will continue to be paid to husband. The two corporations have averaged income of $207,434.00 for the past five years, up to 2004. Doing a four year average to not include Walluski's big year in 2000 leaves an average of $52,671.00. According to Mr. Fagin, historically, the parties have withdrawn $200,000.00 to $250,000.00 from the business each year. * * *"

The trial court went on:

> "I believe the well has gone dry as far as the business being able to sustain the lifestyles husband and wife have adopted during the marriage and in particular the last two years. I expect husband, with his innovative talents, will

continue to keep Walluski competitive and the business will continue to be profitable. However, more attention will need to be given to investing some of the income back into the business and keeping suppliers current with their bills. Mr. Fagin or Mr. Conner did not indicate how much profit should be kept in the corporation but holding back sufficient income to run the operation should still leave $40,000.00 available. With his salary, husband is expected to have $188,298.00 available to him to meet his living expenses, support obligations and personal needs."[1]

The trial court awarded total assets in the amount of $1,419,919 to wife, $2,489,046 to husband, and ordered husband to pay an equalizing judgment to wife of $534,563.50. In the asset division, husband received the business properties and assets, and wife received the primary residence with an encumbrance, the income-producing gravel pit property, and the Washington coast investment properties. The house was valued at $720,000 and had a mortgage in the amount of $155,219. The Oregon coast condominium was to be sold and the proceeds divided equally. The personal property was divided equally. After sale of the condominium and payment of the equalizing judgment, wife would have $791,171 in liquid assets, exclusive of money held in checking and savings accounts.

In the property allocation, husband was awarded the Bumble Bee property, which was initially acquired with Walluski resources; husband testified that it was purchased to expand the business. The office building on that property could be rented for $3,000 per month, whether to Walluski, Versa, or another entity; there was indeed evidence of payment of rent for $5,000 in the past. In its ruling, the trial court stated that the "natural inclination" was to award the Bumble Bee property to wife, which would have left a more equal initial property division and would have created rental income for wife. However, the court acknowledged that husband would need to maintain and expand the business for both parties to attempt to continue their present lifestyles. Therefore, the court awarded the Bumble Bee property to

---

[1] The trial court understated husband's income potential by failing to include $9,000 in annual income from equipment rentals. Husband's projected income is $197,298 per year or $16,441 per month.

husband, with the caveat that, "[i]n the event wife ends up owning the Bumble Bee property, the spousal support will be adjusted." In the court's view, husband needed the property in order to maintain and expand the business and his income, and if he was unable to pay the equalizing judgment to wife, she would be awarded the Bumble Bee property. Husband satisfied the equalizing judgment.

The trial court found husband's living expenses to be $2,480 per month. Those expenses did not include the cost of living in housing that was equivalent to the family home. Husband also had monthly obligations for the following: child support (approximately $400), college expenses ($1,620), health insurance expenses for himself and the children ($803), and taxes (approximately $6,576 at a 40 percent income tax rate). There was no evidence on any debt service on the money borrowed to pay the equalizing judgment. Much of husband's travel, entertainment, and transportation expenses would continue to be paid by the business. After payment of those monthly expenses, husband would have $4,562 in net monthly income available for payment of spousal support and other expenses (vacation and entertainment). That amount will increase when the child support and college expenses end.

The trial court found wife's monthly expenses to be $9,989, including income and property taxes, $2,600 per month for the home mortgage, and $800 per month for upkeep for the horses and other animals. Those expenses assumed that wife would continue to occupy the family home. According to the evidence at trial, wife could earn up to $1,500 per month. She would have $1,000 in rental income from the gravel pit property. The trial court found that wife would obtain $3,150 in monthly income from her investments. According to the trial court's calculations, wife's monthly expenses would likely exceed her income by $4,339 per month. Those expenses would pay for a standard of living roughly comparable to that enjoyed by wife during the marriage.

The trial court ordered husband to pay "step-down" maintenance spousal support to wife in the amount of $8,000 per month for four months, $7,000 per month for one year,

$6,000 per month for the next 18 months, and $5,500 per month for an indefinite time thereafter. Husband disputes the award of spousal support to wife and argues that it does not adequately take into account the amount and nature of the assets awarded to wife and the investment income that she could earn from those assets. He also contends that the family businesses were in financial peril and that the trial court overestimated his income.

Wife contends that husband "ratified" the trial court's order of spousal support by accepting the benefit of the property division, which included an award to husband of the Bumble Bee property. She argues that the trial court gave husband the option of allowing wife to have that property and its rents, thereby reducing his spousal support obligation, or accepting the Bumble Bee property himself and paying a higher support amount to wife.

ORS 107.105(1)(d)(C) contains a nonexhaustive list of factors that the court considers in making either a specified or indefinite spousal maintenance determination:

"(i) The duration of the marriage;

"(ii) The age of the parties;

"(iii) The health of the parties, including their physical, mental and emotional condition;

"(iv) The standard of living established during the marriage;

"(v) The relative income and earning capacity of the parties, recognizing that the wage earner's continuing income may be a basis for support distinct from the income that the supported spouse may receive from the distribution of marital property;

"(vi) A party's training and employment skills;

"(vii) A party's work experience;

"(viii) The financial needs and resources of each party;

"(ix) The tax consequences to each party;

"(x) A party's custodial and child support responsibilities; and

"(xi) Any other factors the court deems just and equitable."

In awarding spousal support, "[n]o one factor is dispositive." *Arand and Arand*, 182 Or App 368, 374, 49 P3d 799 (2002). It is clear, however, that, in a long-term marriage like the one in this case, the primary goal of maintenance support is to provide a standard of living comparable to the one enjoyed during the marriage. *Mallorie and Mallorie*, 200 Or App 204, 219-20, 113 P3d 924 (2005), *rev den*, 340 Or 18 (2006). As we recently stated, we "take[ ] seriously [our] practice of not micro-managing trial court decisions that disentangle the economic affairs of divorcing spouses, unless we can meaningfully improve on such decisions." *Potts and Potts*, 217 Or App 581, 586, 176 P3d 1282 (2008). Recognizing that a marital dissolution "involves the calibration of multiple socio-economic objectives with respect to which trial courts have a range of reasonable discretion to fashion an equitable outcome," *Gardner and Gardner*, 212 Or App 148, 156-57, 157 P3d 320 (2007), we assume that there "often can be more than one overall economic solution that would withstand an appeal from a dissolution judgment. * * * This jurisprudential approach serves both as an invitation to principled arguments and a statement of self-restraint in favor of stability." *Id.*

**5-7.** A judgment may provide for a larger maintenance award initially and a reduced award after a spouse has had an opportunity to achieve financial independence. *Roppe and Roppe*, 186 Or App 632, 637, 64 P3d 1145 (2003). Furthermore, future step-down support may be continued indefinitely where necessary to allow the supported spouse to maintain a lifestyle not overly disproportionate to that enjoyed during the marriage. *Id.* at 638. A spousal support order should be based on circumstances existing at the time of dissolution, but must also take into account the lifestyle enjoyed by the parties during the marriage. *Weber and Weber*, 184 Or App 190, 199, 56 P3d 406 (2002), *rev'd on other grounds*, 337 Or 55, 91 P3d 706 (2004). In addition, the trial court cannot set spousal support at a higher level than the obligor can pay at the time of dissolution, because an income forecast must be predicated on facts existing at the time that the award is made. *Id.* at 201.

■ It is also well-established that awards of spousal support are "not precluded when one party receives a lump sum award," like the equalizing judgment in this case. *Bounds and Bounds*, 185 Or App 619, 624, 60 P3d 1090 (2003). As long as it is otherwise just and equitable to award wife support to allow her to maintain a standard of living not overly disproportionate to that available to the parties during the marriage, spousal support is not precluded because wife also received a large property or asset division. *Id.*

■ As an initial matter, wife's argument that husband should not be able to "attack the decree" while at the same time relying on its benefits is not well taken. *See Nickerson and Nickerson*, 296 Or 516, 518-19, 678 P2d 730 (1984). Unlike in dissolution cases where one party sold or mortgaged property awarded him by a trial court order and then disputes the award of that property, here husband challenges the trial court's valuation of the business property and his income from that source. The Bumble Bee property is a part of that calculation insofar as husband's ownership of that property will enable him to expand the business and maintain his income, as husband testified. Husband merely asserts that the business as a whole will not generate the income that the court calculated.

Furthermore, the trial court merely made husband's ownership of the Bumble Bee property contingent on payment of the equalizing judgment, which was roughly the value of that property, stating that if husband did not pay that judgment in full within 60 days, wife would receive the Bumble Bee property. Husband's "acceptance" of the Bumble Bee property as part of the property division does not preclude his appeal of the amount and duration of spousal support.

■ To assess the amount and duration of spousal support under ORS 107.105(1)(d)(C), we first examine the relative income and earning capacity and financial resources of the parties. Husband's expert testified at trial that wife could invest the equalizing judgment and her other liquid assets and receive a comfortable seven to eight percent annual return. Wife did not offer any evidence to controvert that expert testimony. The trial court found a very different

return on wife's investments in its calculation; however, if we were to take husband's expert testimony into consideration, and use the estimate of a seven percent return, then wife would enjoy $4,615 per month in investment income. It is appropriate for this court to consider expert testimony regarding investment prospects if there is evidence in the record to support it. *Smith and Smith*, 168 Or App 349, 352, 7 P3d 559 (2000); *Batt and Batt*, 149 Or App 517, 522, 945 P2d 517, *rev den*, 326 Or 233 (1997); *cf. Bounds*, 185 Or App at 624 (refusing to consider wife's potential investment income from equalizing judgment and presume a rate of return absent evidence in the record regarding that potential return). Here, there is uncontroverted evidence in the record that wife could receive a substantial income from the property distribution and equalizing judgment. Based on that evidence, wife's monthly expenses would exceed her expected monthly income by $2,874.

█ We next turn to husband's income. Husband received both Walluski Western and Versa at an agreed value of over $1.4 million. That value was based on a joint appraisal that was reviewed and verified by both parties' independent appraisers. Husband's expert at trial testified that the five-year adjusted gross income from the business was $27,180 per month ($326,160 annually). Wife agreed with that figure; wife's attorney further stated in his closing argument that husband's salary was not the "limit of his income," but that the business actually generated profits above that income.

However, husband testified that he would have only his salary available to him. Indeed, testimony by Versa's accountant and husband's witness, Fagin, was that Walluski had "about forty-five days worth of operating funds." Fagin also testified that there was an under investment in the capacity of the business to grow, that there were too many outstanding bills to pay, and that the outlook was "bad." However, Fagin also testified that the "bad" outlook scenario took place each year and that, when profits came in, they were historically able to keep the business profitable in the end.

Based on the testimony of husband, his accountant and CPA, wife's CPA, and its own review of numerous documents, the trial court calculated a $148,298 yearly average for husband's salary from the corporations for the past five years. The court acknowledged that large sums had also been taken above husband's salary to pay for the couple's lavish lifestyle, including their purchase of real property. The court stated that the business could not continue to pay for that lifestyle, but that it would continue to be profitable. Husband did not dispute his salary.

We do not find the trial court's calculation of $148,298 salary plus $40,000 in annual draws from the business to be unreasonable considering the circumstances. The trial court's calculation of $40,000 that would be available over and above husband's salary was conservative based on husband's testimony and the exhibits and expert testimony that the court considered in its evaluation. Husband's assertion on appeal that he will have only his salary available to him, and not the $40,000, is unpersuasive in light of his own testimony and that of his experts.

 Finally, we address the trial court's award of step-down spousal support to wife. In so doing, we reiterate the caution expressed in *Potts*, 217 Or App at 589 n 4:

"We readily acknowledge that the exercise in which we have engaged is fraught with assumptions that may not prove out. That uncertainty is partly owing to the nature of the record before us but, more fundamentally, it is the inevitable product of a concatenation of both interdependent and unrelated estimates that dance at the edges of speculation. In short, even where arithmetic calculations are concerned, the assessment of a spousal support award is often far from an exact science."

"In determining an award of spousal support, * * * [o]ur goal is not necessarily to equalize the parties' incomes or to enable [one party] to look indefinitely to [the other party] for support." *Hoag and Hoag*, 122 Or App 230, 233, 857 P2d 208 (1993). Instead, we evaluate the statutory circumstances and equitable considerations and award a reasonable amount, one that is not overly disproportionate to

the standard of living enjoyed during the marriage. *Id.* at 234. Again, those considerations include the age and health of the parties, their earning capacities, the extent to which their relative earning capacities are affected by an absence from the work force for family considerations, and net spendable income available to the parties. ORS 107.105(1)(d)(C); *Taylor and Taylor*, 136 Or App 416, 419, 902 P2d 120 (1995). Here, however, even assuming that wife obtains modest employment at $1,500 per month (a conservative estimate considering wife's real estate and business skills), with her liquid assets and potential investment income from those assets, she will be capable of meeting her expenses eventually without the high level of spousal support ordered by the trial court. Considering the equalizing judgment and wife's investment income potential, the trial court erred in ordering such a large amount of spousal support.

However, in contrast to husband's view, the statutory factors under ORS 107.105(1)(d)(C) militate in favor of a substantial and indefinite award of maintenance spousal support. This is a marriage of long duration. Wife has limited employment skills and will never attain the earning capacity of husband. The amount of wife's future income is unpredictable. She devoted her time and labor to the family business for a long time and made a substantial investment in that business. A productive return on that family business investment is less speculative than other investments now available to her. Those past investments and future disparities support an award of permanent support.

On the other hand, we believe that the amount of spousal support is outside the "range of reasonableness by a significant enough margin so as not to be just and equitable in the totality of pertinent circumstances." *Potts*, 217 Or at 587. We agree with the trial court that there should be a considerable level of support for wife before the time that the equalizing judgment is paid, the condominium is sold, and wife invests her assets. We conclude that wife could enjoy at least $1,456 per month more investment income than the trial court attributed to her, given the undisputed evidence by husband's expert, but recognize that prediction of financial return is necessarily uncertain.

After considering the statutory factors under ORS 107.105(1)(d)(C), including the property distribution, equalizing judgment, wife's monthly expenses, husband's available income above his expenses, and the testimony in the record, we modify the "step-down" maintenance spousal support awarded to wife to reduce the obligation to $4,500 per month effective on the issuance of the final appellate judgment in this case.

Dissolution judgment modified to reduce spousal support to wife to $4,500 per month effective on issuance of final appellate judgment in this case; otherwise affirmed.